**James W. WINKLE, Appellant,**

v.

**Frances M. WINKLE, Appellee.**

No. 13–95–089–CV.

Court of Appeals of Texas, Corpus Christi.

June 12, 1997.

Rehearing Overruled Aug. 7, 1997.

Richard Orsinger, San Antonio, for Appellant.

Scott T. Cook, William A. Dudley, Cook, Dudley & Associates, Corpus Christi, for Appellee.

Before SEERDEN, C.J., and YANEZ and CHAVEZ, JJ.

## OPINION

YANEZ, Justice.

This is an appeal from a reformed final decree of divorce. By seventeen points of error, appellant challenges the sufficiency of the evidence for the finding of fact that he made false and misleading statements to federal investigators regarding the operations of a community corporation, the order to indemnify appellee for any personal liability she may be found to have as a result of a federal investigation into the corporation, the securing of this indemnification through a lien against appellant's separate property, the characterization of a homestead as community property, the securing of reimbursement owed to the community estate through liens against appellant's separate property and against the community property awarded him, the order that he sign a promissory note to secure a money judgment for appellee, the order that he keep appellee on his medical insurance plan temporarily, and the overall property division. Appellant seeks a new division of the marital estate or, in the alternative, a reformed divorce decree. We reverse and remand for a new division of the marital estate and reform the insurance coverage stipulation of the decree.

## FACTUAL BACKGROUND

James W. Winkle, appellant, and Frances M. Winkle, appellee, were married on May 10, 1975. Appellant holds a pharmacy degree and has owned his own pharmacy corporation since 1968. Prior to marrying appellee, appellant had been married three times to two different women. Appellee is a high school graduate and a baton twirling instructor. The couple had no children during their marriage. The day before they married, appellant and appellee signed a promissory note to construct an edifice in which to house appellee's baton twirling business on a lot she owned at 328 Saturn in Corpus Christi, Texas. Shortly after the business was established, appellant and appellee established a trophy shop adjacent to it. Once married, appellant and appellee initially resided in a house at 104 Shore Drive in Portland, Texas, which was appellant's separate property. At this time, appellant owned a corporation by the name of Prescription Center, Inc., organized in 1972, which initially ran four pharmacies. Early in the marriage, he reduced the number of pharmacies in the corporation to one. From the early 1980s through the early 1990s, appellant's salary from his pharmacy corporation steadily declined, while revenues to the corporation from rental properties acquired by the corporation steadily increased.

In 1977, the couple moved from 104 Shore Drive into another house, with plans to design and build another home for themselves in the future. The couple eventually contracted for the sale of the home at 104 Shore Drive, contingent on a minimum price and on their ability to purchase a vacant lot at 904 Waterview. The couple expended $1250 in community funds as a down payment on the lot at 904 Waterview. When the sale of the home at 104 Shore closed in late 1977, $23,750 from the sale was applied by the title company directly to the balance due on the lot at 904 Waterview. Appellant then paid for much of the construction of the home on this lot from his separate estate.

While at an international twirling event in Japan in 1982, appellee and an associate, Jackie Stewart, were impressed by a Japanese athletic shoe. Appellant, appellee, and associates Mike Stewart and Jackie Stewart, a married couple, then began investigating the possibility of commercially importing this shoe into the United States. A.B.C. Trading Company in Japan was hired to facilitate the exportation of these shoes. On November 3, 1983, they established In–Step International, Inc. (hereinafter "In–Step") for the purpose of importing and selling the shoes. Appellant served as incorporator; appellant, appellee, the Stewarts, and Alan Kramer constituted the corporation's initial board of directors. By agreement, the Stewarts, residents of Indiana, were to run the northern division of the corporation, while appellant and appellee were to run its southern division. Mr. Stewart served as the initial president of the corporation, and his tenure lasted ten years. Appellant served as treasurer of the corporation for ten years. In July of 1992, the Stewarts resigned as officers of the corporation. In

October of 1992, appellee purchased from the Stewarts 2100 shares of stock in In-Step, using funds from her separate estate. In consideration of this change in ownership, appellant became the corporation's president and appellee became its secretary/treasurer, effective October 13, 1992.

Appellant and appellee separated in late October of 1992. On January 11, 1993, a district court issued temporary orders by agreement of the parties. For the pendency of the divorce, the court ordered that appellee would have sole and exclusive authority over the corporate affairs of In-Step International, and enjoined appellant from interfering in any way with appellee's exclusive control over the corporation. Following their separation, appellee learned that appellant had been having an adulterous relationship over the past several years. In August of 1993, appellee began having a sexual relationship with one of the attorneys hired to represent her in the divorce proceedings. In October of 1993, appellant resigned as both the president of and registered agent for In-Step. In April of 1993, in relation to a separate business activity, Mike Stewart, the former shareholder of In-Step International, was charged with mail fraud and was imprisoned for the offense. In late 1993, appellant hired attorney Robert Berg to investigate whether he might face some criminal charges for an alleged double-invoicing scheme used by In-Step to defraud the United States Customs Service.

## DIVORCE PROCEEDINGS

Among various findings of fact and conclusions of law, the trial court determined that appellant owed reimbursement to the community from his separate estate for having enhanced his separate estate in breach of his fiduciary duty to the community; that the separate estate of appellee was due reimbursement from the community estate for funds she had used to purchase 2100 shares of In-Step International; that the separate estate of appellant was due reimbursement from appellee's community estate for separate funds used by appellant for the contract to purchase the lot at 904 Waterview; that appellant made false and misleading state-

ments to the U.S. Customs Service concerning the business operations of In-Step International, which could result in appellee being found personally liable; and that the community estate was insufficient to secure the reimbursement due appellee in relation to appellant's breach of fiduciary duty to the community.

In the final reformed divorce decree, from among the various provisions, the court awarded the capital stock of In-Step to appellant's separate estate and directed appellee to turn over the assets of the corporation directly to appellant. The court ordered appellant to indemnify appellee for any personal liability she might incur pursuant to the customs investigation of In-Step. It also awarded appellee the property and improvements at 904 Waterview to her separate estate, and ordered appellant to pay a money judgment in the amount of $178,370 to appellee, with security imposed by a vendor's lien on appellant's separate estate. The court ordered appellant to turn over various deeds and certificates of title to appellee within ten days and to keep appellee on his insurance policy until she received notice of independent insurance coverage.

## ANALYSIS OF CLAIMS ON APPEAL

Appellant's first four points of error pertain to the trial court's finding that he made false and misleading statements to the U.S. Customs Service, creating a risk that In-Step would be assessed penalties for having violated customs regulations, and for which appellee could be held personally liable. By his first point of error, appellant challenges both the legal and factual sufficiency of the evidence supporting the finding. Appellant argues that appellee informed him of a double-invoicing procedure that she used in the operation of In-Step as a means of paying lower duties on the imported shoes. He claims that he contacted an attorney to look into this matter solely out of concern about his own possible exposure to possible criminal charges for violations of customs laws. Appellant thus argues there is no basis on record for a finding that he made such "false and misleading" statements or that any of his statements to Customs were made to impli-

cate appellee. By his second point of error, appellant claims that the court's order to indemnify appellee for any personal liability she might be assessed was erroneous as a matter of law, because it violates federal law to assign to him the penalties that may be imposed by Customs on appellee for her wrongful actions. Federal customs law, he argues, preempts state-court jurisdiction over the matter of penalties that the U.S. Customs Service may assess against appellee. Appellant claims the order violates State public policy, too, by allowing for a recovery of damages for liability arising from an illegal transaction. Appellant also argues that the order punishes him for carrying out his duty under law to report his knowledge of the apparent violation of federal law by In–Step. By the third point of error, appellant alleges the trial court erred in finding appellant personally liable for the debts of In–Step, where he was not otherwise personally liable. Appellant argues that, in consideration of the nature of corporations, the trial court was without authority to make him responsible for all claims the Customs Service may make against In–Step. By his fourth point of error, appellant argues that the liens against his separate property and the community property awarded him in order to secure the indemnification are invalid, because the liens were imposed simply to secure a just and right division of the marital estate.

■ In reviewing appellant's "no evidence" claim, we must consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary, and if there is any evidence of probative force to support the finding, the point of error must be overruled. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987). In reviewing appellant's factual insufficiency claim, we must review all the evidence supporting and contrary to the finding and may set aside the finding only if it is contrary to the great weight of the evidence so as to make the finding clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). The credibility of witnesses in a divorce action, including the husband and wife, is solely under the purview of the trial court, not an appellate court. *Bailey v. Bailey*, 295 S.W.2d 438, 439 (Tex.Civ.App.— Amarillo 1956, no writ).

■ Reducing the contested finding of fact to three constituent elements, it reads (1) that In–Step could be assessed liability for customs duties, penalties, and interest, (2) because of false and misleading statements made by appellant, (3) to the Customs Service. At trial, appellant and appellee both testified that the Customs Service was investigating In–Step. Though there was no agreement as to the amount of penalties In–Step could be assessed, all parties recognized they could be assessed. That the Customs Service was investigating In–Step for possible violations of customs regulations, and that this could result in liability assessed against the corporation, is, therefore, one element of the finding of fact about which there is no issue. We move to the second element of the finding.

On the basis of the evidence presented, it would seem the court had a factually sufficient basis for determining that appellant made false statements as to his responsibilities with In–Step International, his knowledge of its alleged double-invoicing process, and appellee's relationship to it. Appellant claimed that he played only a minor role in the financial workings of In–Step, that appellee played a much more significant role, and that appellee alone endorsed and implemented a double-invoicing system at In–Step. The record reveals, nevertheless, that appellant served as incorporator of In–Step, then as its treasurer, and ultimately as its president, before resigning as an officer and registered agent in October of 1993. Appellee testified that her primary responsibilities with In–Step during most of its existence were marketing in nature, and that appellant typically directed her to stay out of the financial workings of the corporation. Jackie Stewart, the former In–Step shareholder, also testified that appellant handled most of the financial affairs of In–Step, while she and appellee focused on marketing. Appellee testified that in January 1993, the day after the issuance of the temporary divorce orders, which had granted appellee sole control of In–Step and ordered appellant to refrain

from interfering in In–Step in any way, appellant told her she would "be sorry" for trying to "get it all" in the divorce, and that he would be going to the Customs Service about In–Step. Appellee cited additional threats of revenge against her by appellant, the last one being in May of 1993. In addition, W. Scott Turner, a certified public accountant, testified that at his own deposition, after he explained how appellant's actions had destroyed the value of In–Step, appellant, who was present, "giggled like a little kid that just won a game." Particularly in consideration of the trial court's authority to determine the credibility of witnesses in divorce proceedings, this would appear factually sufficient evidence to support a finding that appellant made false statements about his relationship to In–Step International, the double-invoicing process, and appellee's relationship to it.

The court, however, found that appellant made false and misleading statements *to the Customs Service;* and there is remarkably little evidence to support this element of the contested finding of fact. By his admission, appellant hired Robert Berg to examine In–Step's business operations in relation to customs regulations, and Berg testified that he did contact Customs. Berg testified that it appeared to him that a previous attorney for appellant had contacted Customs on appellant's behalf before Berg did; but he also testified that appellant seemed sincerely concerned about his exposure to criminal charges and not interested in harming his wife. Berg testified that he facilitated at least one meeting between appellant and Customs agents, in consideration of the possibility that appellant would get more lenient treatment from Customs, in the event that In–Step ultimately were found to have violated customs regulations.

Appellant testified that at this first meeting with Customs he gave agent Leroy Kinzel some In–Step tax returns, a file on Mike Stewart's illegal activities in Indiana, copies of two checks from In–Step to the Customs Service, a tariff schedule, other banking records, and a copy of a wire transfer. Berg, who was present for at least part of this meeting, testified that appellant seemed to be conveying to Customs agents the message that he felt he did not deserve any retribution from the criminal justice system, if any were heading his way. Appellant testified that he made no statements about any kind of double-invoicing by In–Step or statements that were intended to lead Customs to accuse the owners or operators of In–Step of having evaded customs duties. Beyond appellee's statement that she believes appellant went to and gave the Customs Service false and misleading information about In–Step, she presented no evidence that specifically challenged appellant's version of what transpired at his first or at any subsequent meeting with the Customs Service, that anything appellant specifically told Customs was false and misleading, or that Customs found anything appellant said to have been false and misleading. In appellee's reply to this point, there are several references to alleged false and "malicious" activities of appellant documented by the statement of facts, but, aside from the comment by appellee just noted, each of these turn out to be discussions of the consequences of the customs investigation that appellant's contact with Customs triggered, not evidence that anything that appellant ever told Customs was false or misleading. Berg testified that when he spoke with Customs agent Kinzel by telephone about the status of the investigation, after appellant had met with Customs, Berg learned that "things were going pretty well" and that Customs believed at least some of the information received from appellant had "checked out" as truthful.

It thus appears to us that the only available option for sustaining the trial court's finding that appellant presented false and misleading information to the Customs Service is to deem it a legitimate inference from the conclusion that appellant lied to the trial court about the nature of his and appellee's involvement with In–Step and its invoicing practices. We are reluctant to do this. First, we note that the trial court made no findings of fact as to the roles either appellant or appellee actually played at In–Step upon which such an inference would be based. Second, while it may be that appellant triggered a Customs investigation in order to harm In–Step, to annoy his wife, to

acquire the corporation, or to achieve any combination of the above, this would not mean that he ever had to lie to Customs, and there remains no evidence that any particular statement he made to Customs was false or misleading. There is, moreover, at least some evidence that some statements appellant made to Customs were truthful. We therefore hold that the evidence supporting this finding is so weak that the finding is clearly wrong and unjust. Point of error one is sustained.

With this finding of fact reversed, the justification for the court's order that appellant indemnify appellee for penalties she personally may be assessed by the Customs Service no longer exists,[1] nor does the justification for a lien against appellant's separate property to enforce the order. Points of error two through four also are sustained.

■ By his fifth point, appellant claims the trial court erred in securing the money judgment for appellee, in the amount of $178,300, through a vendor's lien on the separate property and community property awarded him during the divorce. Appellant argues it is impossible for appellee to have a purchase money lien on the separate property appellant owned before the marriage. By point of error six, appellant claims error in being required to sign collateral documents on his separate property in order to secure the judgment for appellee. In his seventh point, appellant argues the trial court erred in imposing a lien on 100% of the community property assets awarded him, when the vendor's lien exists only as to appellee's one-half community interest in those assets.

■ When dividing marital property upon divorce, and absent a reimbursement interest to the community, trial courts may not impose liens on a spouse's separate property for the general purpose of securing a just and right division of marital property. *Heggen v. Pemelton*, 836 S.W.2d 145, 146 (Tex.1992). But trial courts generally may impose equitable liens on one spouse's separate property as a means for securing the discharge of payments owed by one spouse to the other. *Id.; In re Marriage of Jackson*, 506 S.W.2d 261, 267 (Tex.Civ.App.—Amarillo 1974, writ dism'd); *see also Mullins v. Mullins*, 785 S.W.2d 5, 11–12 (Tex.App.—Fort Worth 1990, no writ) (reviewing case law on authority of trial court's to impose equitable liens on separate property generally); *Day v. Day*, 610 S.W.2d 195, 198 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.) (reviewing the development of this practice). Such liens, however, are permissible only against the separate property to which improvement was made at community expense. *Smith v. Smith*, 715 S.W.2d 154, 161 (Tex.App.—Texarkana 1986, no writ).

In the instant case, the trial court ordered that appellant pay appellee the sum of $178,370 as a means of equally partitioning the community property between the parties. The court also noted that "[b]ecause of the nature of the properties making up the estate, the property cannot be divided in a just and right manner without impairing the value of all portions." The court thus determined that a vendor's lien note in the amount of the money judgment "is necessary to make a just and right partition of the property." The trial court also found that appellant

---

1. In the interest of public policy, we are compelled to note that even if the finding of fact underlying the indemnification order had been supported by sufficient evidence, we nevertheless would hold the indemnification in error as preemption of federal authority.

  As broad as a trial court's discretion regarding the division of marital property at divorce is, *see Murff v. Murff*, 615 S.W.2d 696, 698 (Tex.1981); *see also, Vannerson v. Vannerson*, 857 S.W.2d 659, 672–73 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (sustaining trial court's imposition of the entire tax liability of the parties on one spouse), it may not encroach on the force of federally imposed penalties for violations of federal statutory law. The investigation in this case

apparently had not been completed. If any wrongs by In–Step were committed, appellee, appellant, or both could be determined to be responsible for them, we are unable to imagine an adequate and independent basis in state law that would have allowed the trial court to predetermine what federal authorities were still investigating but also potentially dilute the force of exclusive federal authority to determine what penalties should be assessed against which persons through the indemnification order. *See Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983) (stating the test for whether a state court judgment reaches a question of federal law).

owed reimbursement to the community estate for having enhanced the value of his separate corporation, Prescription Center, Inc., in breach of his duty to the community estate.[2] A lien against the separate corporation alone therefore would have been permissible, but the lien was ordered against Prescription Center, appellant's separate real property in San Patricio and Franklin Counties, and In–Step, which also was awarded to his separate estate. We therefore hold that the trial court abused its discretion in imposing the lien on the separate property of appellant beyond that found to have been benefitted by the community estate. By our disposition of point of error five, the lien is void and we need not address points of error six and seven, which further challenge the lien. TEX.R.APP. P. 90(a).

■ Points of error eight through eleven pertain to the court's characterization of 904 Waterview as community property. By point of error eight, appellant argues that there is legally or factually insufficient evidence in support of the trial court's finding that the house at 904 Waterview is community rather than separate property. Appellant argues that following the purchase of the lot with "presumptively community" funds, exclusively separate funds were used to complete the purchase of the lot, making this real estate separate property as a matter of law. By point nine, appellant contends that if 904 Waterview is community property, then the trial court's finding that his separate estate is not owed reimbursement for the purchase price is erroneous as a matter of law, or against the great weight and preponderance of the evidence. By his tenth point, appellant claims that if 904 Waterview is community property, the finding that his separate estate is not owed reimbursement for enhancement to the value of this property is erroneous as a matter of law or against the weight of the evidence. By point eleven, appellant claims that if 904 Waterview is community property, the trial court abused its discretion in failing to award reimburse-

ment for enhancements to the property in favor of his separate estate.

■ Community property consists of the property, other than separate property, acquired by either spouse during marriage. TEX. FAM.CODE ANN. § 5.01(b) (Vernon 1993). Separate property is that property owned by a spouse before marriage, acquired during the marriage by gift, devise, or descent, or as a recovery for personal injuries sustained during the marriage. TEX. FAM.CODE ANN. § 5.01(a) (Vernon 1993). The characterization of property as either "community" or "separate" is determined by the inception of title to the property. *Smith v. Buss*, 135 Tex. 566, 144 S.W.2d 529, 532 (1940); *Carter v. Carter*, 736 S.W.2d 775, 779 (Tex.App.— Houston [14th Dist.] 1987, no writ). The major consideration in determining the characterization of property as community or separate is the intention of spouses as shown by the circumstances surrounding the inception of title. *Welder v. Welder*, 794 S.W.2d 420, 427 (Tex.App.—Corpus Christi 1990, no writ). Inception of title occurs when a party first has right of claim to the property by virtue of which title is finally vested. *Saldana v. Saldana*, 791 S.W.2d 316, 319 (Tex. App.—Corpus Christi 1990, no writ) (citing *Strong v. Garrett*, 148 Tex. 265, 224 S.W.2d 471 (1949)).

In the instant case, the property at 904 Waterview was purchased during the marriage and intended as a home for the community. The down payment on the lot was paid, by appellant's own testimony, with community funds. The property at 904 Waterview therefore is community property. *Cf. Wierzchula v. Wierzchula*, 623 S.W.2d 730, 731– 32 (Tex.App.—Houston [1st Dist.] 1981, no writ) (holding that inception of title occurs when a party enters into an earnest money contract). Point of error eight is overruled.

■ The $23,750 for the construction of the house taken directly from the sale of appellant's separate-property house, howev-

---

2. The trial court's finding of fact 9(u) states that the community estate is due reimbursement from the separate estate of appellant as a result of "his breach of fiduciary duty owed to the community for his time, toil and talent" used to enhance his separate estate and separate corporation known as Prescription Center, Inc., "for which the community was not adequately compensated in the amount of $421,195."

er, should be reimbursed rather than treated as community living expenses. As a general rule, where separate funds are expended toward the living expenses of the community, they constitute a gift to the community. *See Norris v. Vaughan*, 152 Tex. 491, 260 S.W.2d 676, 683 (Tex.1953); *Trevino v. Trevino*, 555 S.W.2d 792, 802 (Tex.App.—Corpus Christi 1977, no writ); *In re Marriage of Long*, 542 S.W.2d 712, 717 (Tex.Civ.App.—Texarkana 1976, no writ). Using separate property to pay a community debt, however, creates a *prima facie* right to reimbursement, as the separate property may be said to have enhanced the community estate. *See Penick v. Penick*, 783 S.W.2d 194, 196 (Tex.1988); *Jones v. Jones*, 890 S.W.2d 471, 476 (Tex. App.—Corpus Christi 1994, writ denied). The lump-sum use of separate property to retire community obligations on a debt does not amount to a community living expense and gives right to a *prima facie* right to reimbursement. *Graham v. Graham*, 836 S.W.2d 308, 309–10 (Tex.App.—Texarkana 1992, no writ). The $23,750 from the sale of appellant's separate property was applied in one lump sum for the purchase a community asset. The additional payments from appellant's separate estate toward construction of the house also should be reimbursed rather than treated as community living expenses. Unlike living expenses such as food or rent, the property acquired was not transitory. Rather, it enhanced the value of the community estate and endured after the dissolution of the marriage. We hold that the trial court erred in denying the claim of reimbursement to appellant's separate estate for expenses toward the community house at 904 Waterview and enhancement of the lot. Points of error nine through eleven therefore are sustained.

By his twelfth point of error, appellant claims the trial court erred in awarding both a money judgment and requiring appellant's signing of a promissory note for the same amount of the money judgment. By our disposition of points of error sixteen and seventeen, where we remand for a new division of the community estate, we need not address this point of error. TEX.R.APP. P. 90(a).

By his thirteenth point of error, appellant claims the trial court erred in ordering appellee to turn over assets of appellant-appellee corporation to appellant rather than to the corporation. Appellant observes that corporate assets belong to the corporation and not the shareholders, and thus argues that the court should have ordered appellee to relinquish the assets to the corporation.

When this case went to trial, appellee, under temporary orders, had been granted sole and exclusive authority to manage the corporation; and appellant had resigned as an officer of and registered agent for In–Step. At trial, however, appellant expressed confidence in the continued financial viability of the corporation, confidence in his ability to manage it, and an interest in doing so, pursuant to appellee's wish to distance herself from it. Thus the trial court's order constitutes an effort to transfer appellee's interim complete responsibility for In–Step to appellant, per his express interest in it. We hold that the court committed no reversible error in ordering appellee to deliver to appellant the inventory, accounts receivable and other assets of the corporation. Point of error thirteen is overruled.

By point of error fourteen, appellant claims the trial court abused its discretion in ordering enforcement of the property division within ten days of the final judgment. Appellant observes that under the Texas Rules of Civil Procedure, executions of a final judgment cannot issue until a requisite number of days have elapsed since the judgment or since the overruling of any motions for a new trial.

Except as otherwise provided by statute, enforcement of divorce decrees are governed by the Texas Rules of Civil Procedure. TEX. FAM.CODE ANN. § 3.70(b) (Vernon 1993). We find no exception that would govern the issue at hand. Under Rule 627, executions of final judgments from district courts may not issue until after thirty days have elapsed since the rendition of the final judgment or after the overruling of any motions for a new trial. TEX.R. CIV. P. 627. A prematurely issued execution of judgment, however, is not void, only voidable. *South*

*Falls Corp. v. Davenport*, 368 S.W.2d 695, 697 (Tex.Civ.App.—Dallas 1963, no writ). The execution may not be collaterally attacked and must be respected until it is vacated in a direct proceeding instituted in the court which ordered it to be issued. *Id.* Attack of the execution of this particular enforcement order before this Court rather than the issuing district court, therefore, is inappropriate. Appellant also has articulated no particular harm done to him by the trial court's premature order of execution; and, at this point, given no apparent harm from the order, the point is moot. Point of error fourteen is overruled.

■ By his fifteenth point, appellant claims the order for him to pay appellee's medical insurance constitutes an impermissible award of alimony because of its indefinite duration. Appellee charges that the order is consistent with state and federal statutes allowing a divorcing spouse to continue the group health insurance benefits available to her a dependent under appellant's insurance policy.

The court order does track the state and federal public policy requirement that a divorcing spouse have the option to continue group major medical benefits that have been available under his or her spouse's insurance policy. *See* TEX. INS.CODE ANN. art. 3.51–6, § 3B(h) (Vernon Supp.1997); 26 U.S.C. § 4980B *et seq.* Under the Texas law, the dependent must give written notice to his employer within fifteen days of the severance of a family relationship that might activate this continuation option. TEX. INS.CODE ANN. art. 3.51–6, § 3B(m)(4) (Vernon Supp.1997). By written notice to the employer, a covered dependent must exercise the option to continue coverage within sixty days from the severance of the family relationship or the option expires. *Id.* at § 3B(b)(i). Provided policy premiums are paid, the insurance policy remains in effect during this sixty day period. *Id.*

The divorce decree ordered appellant to inform his employer of the relevant severance in the family relationship within fifteen days of the signing of the divorce decree. It ordered appellant to pay for the coverage of appellee until appellee is informed that her independent coverage has gone into effect. By our reading, the statute would preclude appellant from being held liable for appellee's coverage beyond sixty days from the date of the divorce, so the decree should be reformed to reflect appellee's limited time for exercise of her coverage option and that appellant's duty to maintain appellee's coverage is limited to sixty days from the date the divorce decree becomes final. Point of error fifteen is sustained.

■ Points of error sixteen and seventeen pertain to the overall property division by the trial court. By his sixteenth point, appellant claims the property division order constitutes an abuse of discretion. Appellant argues the trial court faulted appellant's adultery but gave no weight to appellee's, and awarded appellant a corporation that appellee valued at zero, while simultaneously assigning him any liabilities the corporation may be found have for unpaid customs duties. By his seventeenth point, appellant claims the trial court erred as a matter of law in concluding that the property division was just and right "irrespective of the character of any items of property as either separate or community." This conclusion, appellant argues, reveals the court acted without reference to the guiding rules of dividing property upon divorce.

■ The trial court is vested with broad discretion in dividing the marital estate at divorce. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex.1981); *Vannerson v. Vannerson*, 857 S.W.2d 659, 672–73 (Tex.App.—Houston [1st Dist.] 1993, writ denied). There is no requirement that the property be divided equally, *In re Marriage of Jackson*, 506 S.W.2d at 267, and a clear abuse of discretion is shown only if the division of property is manifestly unjust and unfair. *Trevino*, 555 S.W.2d 792, 802. A court of appeals should remand the entire community estate for a new division when it finds reversible error in a specific part of the division that materially affects the trial court's "just and right" division of the property. *Jacobs v. Jacobs*, 687 S.W.2d 731, 732 (Tex.1985).

■ The evidence presented in this case demonstrated that appellant had committed

adultery long before appellee, and that appellee began her adulterous relationship only after she and appellant had separated and she had learned of appellant's adultery. The trial court therefore had a legitimate basis for finding appellant's adultery cruel treatment toward appellee. By his own testimony, appellant believed In–Step to be a financially viable corporation and expressed his interest in managing the corporation. It thus is disingenuous for appellant to lament the trial court's awarding of control of the corporation to him. We recognize, nevertheless, that the trial court erred in granting indemnification to appellee for any personal liability in connection with In Step, which was a community asset awarded to appellant, could have influenced the general scheme of the trial court in dividing community assets. The trial court also erred in failing to recognize the right of reimbursement to appellant's separate estate for expenses paid toward the community house at 904 Waterview. Points of error sixteen and seventeen are sustained.

Accordingly, the division of the marital estate is reversed and remanded for a new division consistent with this opinion. The health insurance coverage provision of the decree is reformed to reflect that appellee has only sixty days in which to exercise her option to continue coverage.