**Christina Teadora Varrasso LOAIZA, Appellant,**

v.

**Esteban Antonio LOAIZA, Appellee.**

No. 2–02–361–CV.

Court of Appeals of Texas, Fort Worth.

March 11, 2004.

Rehearing Overruled April 29, 2004.

896

Shannon, Gracey, Ratliff & Miller, L.L.P., Joseph E. Spence, J. Christopher Nickelson, Gary L. Nickelson, Fort Worth, TX, for Appellant.

Kobs & Haney, P.C., Jeff H. Kobs, Mark A. Haney, Fort Worth, TX, Lori Deangelis, Charles Smith, Arlington, TX, for Appellee.

PANEL A: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

Christina Teadora Varrasso Loaiza appeals from the trial court's decree granting her and Esteban Antonio Loaiza a divorce and dividing the marital estate. In one point, appellant argues that the trial court abused its discretion by failing to make a just and right division of the community estate. Specifically, appellant contends that the trial court erred by finding that she failed to prove by a preponderance of the evidence that appellee wasted community assets, breached fiduciary duties owed to appellant, or committed fraud on the community. Additionally, appellant argues that the trial court erred in characterizing appellee's post-divorce guaranteed payments under his baseball contract with the Toronto Blue Jays as his separate property. We affirm.

## FACTS

Appellant married appellee, a major league baseball player, in October of 1998. Prior to the wedding, appellee's team traded him to the Texas Rangers. Two weeks before his wedding to appellant, appellee began an affair with 19–year–old Ashley Esposito, a nanny employed by one of his teammates. A few days before the wedding, Ashley began making harassing phone calls to appellant. When confronted, appellee denied having an affair. Ashley continued calling appellant, as well as appellant's mother and sisters, after the parties' marriage and during the 1999 baseball season, telling them she and appellee were having an affair and threatening to harm appellant.

In January of 2000, appellant and appellee bought a lot and began building a home in Pennsylvania. While the home was being built, appellee left for Texas to begin spring training with the Texas Rangers. The threatening calls from Ashley began again. In July of 2000, while appellant was at a wedding in Mexico, appellee met Ashley at a resort in Arizona. Appellee also invited his cousins and paid for everyone's airfare and hotel. During this rendezvous, Ashley told appellee that she was pregnant with his child.

Shortly after appellee's trip with Ashley, he was traded to the Toronto Blue Jays. Appellant and appellee moved to Toronto for the remainder of the 2000 season. Around the same time, appellee began making plans to divorce appellant. He purchased Ashley a $64,000 Lexus and bought both his brother and sister new cars at about $30,000 each. On August 31, 2000, appellee filed for divorce in Tarrant County, Texas, but did not tell appellant that he was divorcing her. Instead, he

told her he would return home to her in Pennsylvania after the last game of the 2000 season. Instead, he flew to DFW and went shopping for a home with Ashley in Texas.

Two days after appellee's arrival at DFW, he and Ashley both signed papers to lease a house, with an option to purchase it in the future. Appellee used $75,000 in community funds as the down payment for the purchase option. Several days later, appellee's attorney forwarded the divorce papers to appellant. In November and December of 2000, appellee purchased several Rolex watches for teammates, a car for his mother, and two cars for himself all totaling approximately $184,000.

During his separation from appellant, appellee signed a contract with the Toronto Blue Jays on February 27, 2001. The contract "guaranteed" appellee payments of $4 million in 2001 and $5.8 million in 2002. Appellant continued his affair with Ashley, who had his baby in March 2001. Appellee paid all her medical bills. Additionally, appellee paid Ashley's mother $72,000 a year to care for the baby during the day.

At trial, the court ruled that the parties were divorced as of April 30, 2002. The trial court found that appellant did not prove by a preponderance of the evidence that appellee wasted community assets, breached fiduciary duties owed to appellant, or committed fraud on the community. Additionally, the trial court determined that the post-divorce payments under the Toronto Blue Jays contract were appellee's separate property because he was required to complete his services as a baseball player before he was entitled to the money.

## STANDARD OF REVIEW

■ A trial court has broad discretion in dividing the marital estate, and we pre-sume the trial court exercised its discretion properly. *Murff v. Murff,* 615 S.W.2d 696, 698–99 (Tex.1981). In dividing the parties' community estate, the trial court shall order a division of the property that it deems just and right, having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001 (Vernon 1998). The party who complains of the trial court's division of property must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion. *Zeptner v. Zeptner,* 111 S.W.3d 727, 734 (Tex.App.-Fort Worth 2003, no pet.) (op. on reh'g); *Pletcher v. Goetz,* 9 S.W.3d 442, 446 (Tex.App.-Fort Worth 1999, pet. denied) (op. on reh'g).

■ The trial judge may order an unequal division of marital property when a reasonable basis exists for doing so. *Massey v. Massey,* 807 S.W.2d 391, 398 (Tex.App.-Houston [1st Dist.] 1991), *writ denied,* 867 S.W.2d 766 (Tex.1993). This court will correct the trial court's division of marital property only when an abuse of discretion has been shown. *Murff,* 615 S.W.2d at 698; *Massey,* 807 S.W.2d at 398. It is this court's duty to consider every reasonable presumption in favor of the proper exercise of discretion by the trial court in dividing the community estate. *Murff,* 615 S.W.2d at 698; *Massey,* 807 S.W.2d at 398.

■ To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in similar circumstances does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 241–42.

■ Under an abuse of discretion standard, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion. *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Zeptner*, 111 S.W.3d at 734. They are not, however, independent grounds of error. *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex.App.-Austin 2000, no pet.); *Crawford v. Hope*, 898 S.W.2d 937, 940 (Tex.App.-Amarillo 1995, writ denied).

## Waste of Assets, Fiduciary Duty, and Fraud

Appellant argues that the trial court abused its discretion by failing to divide the community estate of the parties in a just and right manner. This argument is based primarily on appellant's contention that she conclusively established that appellee breached fiduciary duties he owed to her as his wife, committed constructive fraud, and wasted significant community assets. Appellant asserts that the trial court erroneously found that she failed to prove these claims by a preponderance of the evidence.

■ Appellant contends that appellee committed waste of the assets in the community estate. The Texas Supreme Court has recognized waste of community assets as a factor to be taken into consideration in the division of the community estate. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex.1998); *see also Harper v. Harper*, 8 S.W.3d 782, 783–84 (Tex.App.-Fort Worth

1999, pet. denied). However, while one spouse's fraud on the community estate could justify an unequal division of the estate, "there is no independent tort cause of action for wrongful disposition by a spouse of community assets." *Schlueter*, 975 S.W.2d at 589.[1]

In *Schlueter*, Mrs. Schlueter filed for divorce, complaining that her husband had diverted $12,565 in cash and an emu business worth $10,000 to his father to avoid having these assets included in the community estate. *Id.* at 586. The jury found that Mr. Schlueter had defrauded the community estate and the trial court rendered judgment that the community recover $12,850 from Mr. Schlueter and his father, jointly and severally, that Mrs. Schlueter recover $30,000 in punitive damages and $18,500 in attorney fees from her husband, and $15,000 punitive damages from her father in law. *Id.* The court of appeals affirmed. *Schlueter v. Schlueter*, 929 S.W.2d 94 (Tex.App.-Austin 1996), *rev'd*, 975 S.W.2d 584 (Tex.1998). The Texas Supreme Court reversed, holding that one spouse's fraud on the community estate could justify an unequal division of the estate but that there is no independent tort cause of action for wrongful disposition of community assets by a spouse. 975 S.W.2d at 589–90.

■ In addition to waste, appellant complains that appellee breached his fiduciary duty to her and committed fraud. A fiduciary duty exists between a husband and a wife regarding the community property controlled by each spouse. *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex.App.-Houston [14th Dist.] 1996, no writ) (op. on reh'g); *In re Marriage of Moore*, 890 S.W.2d 821, 827 (Tex.App.-Amarillo 1994,

---

1. We note that the *Schlueter* holding is limited to claims based on waste of community assets, fraud on the community estate, and related punitive damages. *See Schlueter*, 975 S.W.2d at 589.

no writ). "Fraud on the community" is a judicially created concept based on the theory of constructive fraud and is applied when there is a breach of a legal or equitable duty, which violates this fiduciary relationship existing between spouses. *Zieba,* 928 S.W.2d at 789; *Moore,* 890 S.W.2d at 827. Although not actually fraudulent, any such conduct in the marital relationship is termed fraud on the community because it has all the consequences and legal effects of actual fraud since the conduct tends to deceive the other spouse or violates marital confidences. *Zieba,* 928 S.W.2d at 789; *Moore,* 890 S.W.2d at 827.

A presumption of constructive fraud arises where one spouse breaches the fiduciary duty owed to the other spouse and disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. *Zieba,* 928 S.W.2d at 789; *Jackson v. Smith,* 703 S.W.2d 791, 795 (Tex.App.-Dallas 1985, no writ). When that occurs, the burden of proof is on the disposing spouse to show fairness in disposing of community assets. *Zieba,* 928 S.W.2d at 789; *see also Morrison v. Morrison,* 713 S.W.2d 377, 379 (Tex.App.-Dallas 1986, writ dism'd); *Horlock v. Horlock,* 533 S.W.2d 52, 55 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ dism'd). The court may consider three factors in considering a claim of constructive fraud: "(1) the size of the gift in relation to the total size of the community estate; (2) the adequacy of the remaining estate; and (3) the relationship of the donor to the donee." *Zieba,* 928 S.W.2d at 789 (citing *Horlock,* 533 S.W.2d at 55).

Appellant presented evidence at trial that appellee made the following expenditures out of community funds without appellant's knowledge or consent:

- $64,732.32 on a Lexus for his girlfriend Ashley;
- approximately $30,000 in down payments on cars for appellee's sister, mother, and brother;
- $145,809.33 to pay Ashley's medical bills;
- $78,436.56 to Ashley's mother, primarily for child care for appellee and Ashley's child, but also including $6,548.68 in payments made before the child's birth;
- $75,000 for the option to buy a house appellee had leased for Ashley and himself;
- $82,550 in payments to appellee's mother;
- $118,745.38 [$70,000 + $48,745.38] in gifts or loans to other members of appellee's family;
- approximately $145,000 on hotels and airfare for trips that appellant did not go on, including trips involving Ashley and her family;
- $38,800 on Rolex watches later sold to teammates;
- approximately $105,500 in checks and cash advances to himself that he could not account for.

Appellee testified at trial and admitted to making many of these expenditures. Ashley also testified that appellee had paid her medical bills.

Courts look with disfavor upon gifts by the husband to "strangers" of the marriage, particularly of the female variety. *Osuna v. Quintana,* 993 S.W.2d 201, 209 (Tex.App.-Corpus Christi 1999, no writ). The court in *Osuna* observed:

It is so repugnant to our sense of justice that this court will never sanction the proposition that a husband may desert his lawful wife, and while living in adultery with another woman, donate to the latter as a gift his wife's interest in the property owned by them in common.

. . . .

.... Money spent on another woman out of community property during the marriage requires an accounting to the community. This type of gift or expenditure amounts to fraud upon the community estate.

*Id.* at 208–09 (citations omitted). The fact that many of appellee's expenditures were made for the benefit of Ashley conclusively establish a breach of fiduciary duty and constructive fraud. *See Zieba,* 928 S.W.2d at 789–90 (holding that because husband's expenditures out of community funds on paramours constituted breach of fiduciary duty and waste, the community estate was entitled to reimbursement for those funds).

Appellant also established that the expenditures were made without her knowledge and consent. After such a showing, a presumption of constructive fraud arises and the burden shifts to appellee to show fairness in disposing of community assets. *Id.* at 789; *see also Morrison,* 713 S.W.2d at 379; *Horlock,* 533 S.W.2d at 55. Appellee presented no evidence that the expenditures were fair to appellant or that she consented to them. By failing to show the fairness of the expenditures, appellee failed to rebut the presumption of constructive fraud that arises when one spouse disposes of the other spouse's one-half interest in community property without their knowledge or consent. *See Zieba,* 928 S.W.2d at 789. Therefore, we hold that the evidence conclusively establishes that appellee breached his fiduciary duty to appellant, and committed fraud on the community. The trial court's findings to the contrary are not supported by the evidence.

▪ Regardless, under the holding in *Schlueter,* claims of fraud, waste, and breach of fiduciary duty cannot be brought as separate tort claims of action in a divorce proceeding. 975 S.W.2d at 589. However, such claims are properly considered when dividing a community estate. *Id.* Therefore, the trial court should have ruled against appellant on her independent claims of waste, breach of fiduciary duty, and fraud and the exemplary damages relating to those claims as a matter of law, rather than based on insufficient evidence.

▪ Appellant argues that the adverse findings regarding her independent causes of action for breach of fiduciary duty, fraud, and waste, indicate that the trial court did not consider these matters or the evidence to support them in its division of the community estate.[2] However, the trial court expressly "found" that it considered fraud on the community and waste in awarding appellant a disproportionate amount of the community estate. Appellee contends that regardless of the trial court's negative findings as to the independent causes of action, the trial court clearly took into account fraud and waste when dividing the community estate. We agree with appellee that the trial court clearly considered these factors in its division of the community estate, as evidenced by the resulting disproportionate award in favor of appellant and the trial court's express statement in its findings that it considered waste and fraud in making the award.

▪ Appellee argues that the above factors, among others, resulted in the disproportionate property award in favor of appellant. In his argument, appellee claims the trial court awarded eighty-three percent of the community estate to appellant. He asks this court to include $412,932.87 in temporary support received and not spent by appellant before the di-

---

**2.** Under *Schlueter,* appellant could not recover on these independent claims, but the trial court could properly consider appellee's wrongful conduct when dividing the community estate. 975 S.W.2d at 589.

vorce in estimating that she received eighty-three percent of the community estate. He ignores the fact that they each received $70,500 per month of temporary spousal support, but that appellee spent all of his portion. His argument is flawed because he spent all of the temporary support he received, whereas, appellant saved some of hers. The trial court agreed with appellant when it determined that any money received by the spouses under temporary awards should be credited to each parties' estate. We do not think that appellee should be allowed to inflate appellant's percentage of the award by taking into account her share of the temporary support and omitting appellee's share from consideration. Therefore, in calculating the portion of the community estate awarded to appellant, the trial court correctly omitted the $412,932.87 of temporary support saved by appellant during her separation and awarded to her in the divorce.

According to the property values listed in appellant's amended inventory and appraisement and in the divorce decree, the trial court awarded appellant accounts totaling $677,254.78 ($1,090,187.65 if we include the $412,932.87 of temporary support saved by appellant during her separation). Additionally, the trial court awarded appellant a money judgment against appellee in the amount of $110,000. The trial court also awarded appellant the Pennsylvania home worth an estimated $840,000, but with a mortgage of approximately $770,000, leaving a net equity of approxi-

mately $70,000. Appellant also got the Porsche with an estimated value of $64,500, but with a balance owed of $34,834.44, equaling a net equity of $29,665.56. She therefore received, in cash and net equity, approximately $886,920.34 (if we include the $412,932.87 of temporary support appellant saved, the total is $1,299,853.21).[3]

The trial court awarded appellee accounts totaling $96,891.10, the leased property in Texas, his retirement accounts valued at $40,991.42, and cars with equity totaling over $100,000.[4] However, since appellee received and spent his half of the temporary support prior to the divorce, he was not awarded that money in the divorce. Therefore, in calculating the percentage of the community estate awarded to appellant, the remaining balance of $412,932.87 of temporary support saved by appellant should not be included. Thus, the community estate totaled approximately $1,141,894.73; appellant received approximately seventy-seven percent of the community estate and appellee received twenty-three percent.

In its findings, the trial court stated that it considered the following factors in making a disproportionate award in favor of appellant: (1) fault in the break up of the marriage; (2) fraud on the community; (3) benefits the innocent spouse may have derived from the marriage; (4) disparity of earning power; (5) appellant's education and employability; (6) community liabilities; (7) tax consequences; (8) earning power of spouses; (9) need for future sup-

---

**3.** We note that appellant's brief states that appellant received a **net equity** of $843,000, but appellant then proceeds to subtract the $770,000 mortgage and the debt on the Porsche at $34,834.44. However, by our calculations, the mortgage and the debt were subtracted before arriving at appellant's total net equity. Appellant's method subtracts the mortgage and debt twice.

**4.** Certain values were omitted in appellee's amended inventory and appraisement regarding a ninety-nine green Navigator given to appellee's brother, so zero dollars of equity were included in our calculation for that car.

port; (10) nature of the property; (11) waste of community assets; (12) community funds to purchase out-of-state property; (13) gifts to or by the spouses during marriage; (14) reimbursement; (15) attorney's fees; (16) creation of community property by the effort of the spouses. As we noted above, consideration of these factors by the trial court resulted in a disproportionate award in favor of appellant of seventy-seven percent.

Texas law requires that an effort be made to reconcile conflicts in findings of fact. *First Fin. Dev. Corp. v. Hughston*, 797 S.W.2d 286, 294 (Tex.App.-Corpus Christi 1990, writ denied). This same rule has been applied to conflicts between findings of fact and conclusions of law. *Hartford Ins. Co. v. Jiminez*, 814 S.W.2d 551, 551–52 (Tex.App.-Houston [1st Dist.] 1991, no writ). In reconciling findings of fact, conclusions of law, and the judgment when two possible interpretations exist, the interpretation should be chosen that will harmonize the judgment with the findings of fact and conclusions of law upon which it is based. *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 841 (Tex.App.-Texarkana 1996, writ denied).[5]

■ To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that (1) the error occurred; and (2) it probably caused rendition of an improper judgment, or probably prevented the appellant from properly presenting the case to the appellate court. TEX. R. APP. P. 44.1(a); *In re D.I.B.*, 988 S.W.2d 753, 756 n. 10 (Tex.1999); *Tex. Dep't of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.1991). Here, the trial court's insufficiency fact findings on appel-

lant's individual tort actions appear to conflict with its finding that it took the fraud and waste factors into consideration in making the property division. The disproportionate findings for appellant, however, clearly show that the trial court's judgment is based upon the later findings, not former. Therefore, the trial court's insufficiency findings regarding appellant's tort claims are superfluous. Because those findings were unnecessary they did not result in an improper judgment and do not require a reversal of the divorce decree. *See* TEX.R.APP. P. 44.1(a). Consequently, we hold that the trial court did not abuse its discretion in making a seventy-seven to twenty-three percent division of the community estate.

### Toronto Blue Jays Contract

In the second portion of her argument, appellant complains that the trial court erred in characterizing the post-divorce payments, under appellee's contract with the Toronto Blue Jays, as appellee's separate property because the trial court failed to properly determine when appellee acquired the right to be paid under the contract. On August 31, 2000, appellee filed for divorce. He signed the Blue Jays contract on February 19, 2001, and it was effective March 12, 2001, when the office of the commissioner of major league baseball approved it. The parties were divorced on April 30, 2002.

Appellant contends that the employment contract was clear and unambiguous and may be interpreted as a matter of law. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) (stating that interpretation of a written contract is a matter of law if the

---

**5.** Where an abuse of discretion standard of review applies to a trial court's ruling, findings of fact and conclusions of law, while helpful, are not required. *Samuelson v. United Healthcare of Texas, Inc.*, 79 S.W.3d 706, 710 (Tex.App.-Fort Worth 2002, no pet.); *Crouch v. Tenneco, Inc.*, 853 S.W.2d 643, 649 (Tex.App.-Waco 1993, writ denied) (op. on reh'g).

contract is clear and unambiguous). Appellant's briefing focuses on the question of whether the contract was a guaranteed contract. She argues that as a guaranteed contract, the payment rights under it accrued when it was signed, not when services were performed. She contends that the trial court erred by entering findings of fact numbered twelve, thirteen, fourteen, and fifteen.[6] Appellant argues that the trial court's interpretation of the contract was erroneous because it did not give full effect to all the provisions of the contract, imposed a condition precedent where none existed, and ignored the circumstances surrounding the contract.

In contrast, appellee contends that the contract was guaranteed only to the extent that the baseball club promised to pay appellee his salary if he was otherwise willing and able to perform the services under the contract and was not in breach, even if the club no longer used the player's services. Appellee argues that the club was not obligated to pay him if he refused to perform under the contract. He offered evidence to show that in major league baseball, a non-guaranteed contract means that the club is not obligated to pay the player when they no longer use his services. In contrast, a guaranteed contract obligates the club to pay the player even if they decide not to use his services. Appellee claims that under either type of contract the player is required to perform in order to receive payment.

■■■■ Findings of fact are usually reviewed under traditional legal and factual sufficiency standards of review. However, in this case the trial court's characterization of the contract payments for 2002 were based solely upon the trial court's interpretation of the contract. When an appellate court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the appellate court is obligated to interpret the contract as a matter of law. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999); *Coker*, 650 S.W.2d at 393. A contract is not ambiguous merely because parties to an agreement have different interpretations of a term or phrase. *DeWitt*, 1 S.W.3d at 100; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994) (op. on reh'g). A contract is ambiguous only if, after the application of established rules of construction, an agreement is still susceptible to more than one reasonable meaning. *DeWitt*, 1 S.W.3d at 100; *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996).

■■■■ If the meaning of language used in a written agreement becomes uncertain when applied to the subject matter of the contract, the contract is latently ambiguous. *Birmingham Fire Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 947 S.W.2d 592, 603 (Tex.App.-Texarkana 1997, writ denied); *see Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995) (op. on reh'g). Although the determination of whether a contract is ambiguous should be limited to an examination of the language of the agreement, appellate courts may examine extrinsic evidence of "surrounding circumstances" or "the subject matter of the contract" to determine if a latent ambiguity exists. *Birmingham Fire Ins. Co.*, 947 S.W.2d at 603. Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless. *Coker*, 650 S.W.2d at 394. After reviewing the contract in the present case, we hold

**6.** In these findings, the trial court determined that the appellee was required to render his services as a skilled baseball player as a condition precedent to being paid.

that the language of the contract is not ambiguous, and we will interpret it as a matter of law.

The contract at issue is comprised of a Uniform Player's Contract (UPC) and an addendum between the Toronto Blue Jays and appellee. The addendum begins by stating that it "shall be deemed to amend and modify any provisions of, or rules or regulations governing, the UPC inconsistent herewith." The UPC contract provides that "[f]or performance of the Player's services and promises hereunder the Club will pay Player the sum of [$]4,000,000.00 (Four Million dollars) for 2001, and $5,800,000.00 (Five Million Eight Hundred Thousand Dollars) for 2002." According to the UPC, the money was to be paid to appellee in semimonthly installments beginning at the start of the championship season and terminating at the end of the season.

Under the addendum, the club was to pay appellee an additional $500,000 signing bonus. However, the club was relieved of its obligation to make any further payments to appellee—and was entitled to reimbursement of the signing bonus—if appellee failed, refused, or was unable to report to 2001 spring training for any reason other than death or disability. The addendum also provided for his base salary and award bonuses.

Section D of the addendum is entitled "GUARANTEE." Under section D, the "Club and Player agree that Player's base salary for the 2001, and 2002 Major League Championship Seasons is 'guaranteed' in the manner and under the terms and conditions set forth below." The contract goes on to list the circumstances under which the club is relieved of its guarantee to pay appellee's base salary: (a) voluntary retirement; (b) labor dispute; (c) placement on any of the lists set out in Major League Rule 15; (d) suspension by

the club; (e) intentional self-injury or suicide; (f) use of illegal drugs, misuse of prescription drugs, or alcohol dependency; (g) engaging in any inherently dangerous act or sport (e.g.: skydiving); (h) incapacity due to an allegation that player engaged in a criminal act; (i) HIV or AIDS; and *(j) refusal to render services.* Under section D, the payment is still guaranteed, however, if the "[c]ontract is terminated because Player fails . . . to exhibit sufficient skill or competitive ability to qualify or continue as a member of [the] Club," even in the case of death or physical or mental incapacity incurred on or off the baseball field, before, during, or after the season.

Regardless of the above, the contract provides that the obligation to continue payments beyond the date of termination will cease if the player's death or physical or mental incapacity is due to: (1) intentional self injury; (2) use of illegal drugs, misuse of prescription drugs, or alcohol dependency; (3) engaging in an inherently dangerous act, activity, or sport; (4) the player's own criminal act; or (5) incapacity due to the HIV virus or AIDS. The club also has the right under the addendum to convert the guaranteed contract into a non-guaranteed contract in the event that the club discovers that the player is not in first class physical condition due to the use of illegal drugs, misuse of prescription drugs, or alcohol dependency. Additionally, the player is required to complete physical examinations, by a doctor so the club can obtain insurance on the player. If the player refuses to cooperate with the examinations the guarantee is null and void.

An expert on the characterization and valuation of major league baseball contracts, Kathy Kinser, testified for appellant at trial. Kinser testified that appellee's contract was the most guaranteed contract that she had ever seen. She noted that, of all the guaranteed contracts

that she had reviewed, only appellee's contract guaranteed him payment regardless of whether the club allowed him to play or not. According to Kinser, most guaranteed contracts only provide that the player will be paid a portion of his salary if the club determines that he will not play.

Appellee's agent, Anthony Cabral, also testified regarding the contract. According to Cabral, who negotiated the contract for appellee, the contract is only guaranteed if the player is otherwise willing to perform skilled services as a baseball player.

The trial court found that appellee was required to render skilled services in order to receive the future payments under the contract. In its findings of fact, the trial court stated that appellee "was being employed to render his skilled services as a major league baseball player" and that appellee would be paid, "for performances of the Player's services," the sum of $5,800,000 for the year 2002 baseball season. Under section D, Paragraph 1(j) of the addendum, the trial court found that the club was relieved of its guarantee to pay appellee if there was "any refusal by player to render his services." Thus, the trial court determined that appellee was required to render his services as a skilled baseball player as a condition precedent to being paid.

The trial court also found that in the event appellee was ever unconditionally released during the 2002 season from his obligation to perform services pursuant to section D, under paragraph two of the addendum, the remaining payments would be awarded sixty percent to appellant and forty percent to appellee. Even so, if appellee was not unconditionally released, the payments to appellee after the date of divorce "are not, and shall not be, divided as community property."

Appellant contends that the trial court's interpretation is too narrow and fails to give full effect to the parties' intentions. Appellant argues that the trial court's interpretation of the contract ignores the plain language of the contract that states that the club "guarantees to pay" appellee "in full all payments" unless two contingencies arise: (1) the contract is terminated, or (2) appellee does not render his services due to the reasons listed in subparts (a) through (j). Appellant interprets the contingencies as exceptions to the guarantee of payment.

Appellant also finds error in the trial court's reliance on subpart (j).[7] Appellant contends that the plain meaning of subpart (j) dictates that the guarantee would not apply if appellee refused to render his services. Appellant notes, however, that there are numerous situations where appellee would be paid even though he would not be rendering his services, such as if he were hospitalized for an injury. Thus, appellant reasons that paragraph one, subpart (j), does not require appellee to render services before being entitled to payment. Additionally, appellant argues that under the trial court's interpretation of the contract, the post-divorce payments constitute community property only if appellee is unconditionally released from his obligation to render services; otherwise, the payments are considered separate property.

7. Subpart (j) provides:

Club guarantees, in the event that this Contract is not terminated, to pay Player in full payments stipulated in paragraph B, provided, however, that Club shall be relieved of its guarantee to pay Player's Base Salary during any limited period that player does not render his services under the Contract due to ... Any refusal by Player to render his services not listed above.

The Texas Constitution defines separate property as a spouse's real or personal property owned before marriage or acquired during marriage by gift, devise, or descent. TEX. CONST. art. XVI, § 15. Community property consists of property other than separate property that is acquired by either spouse during the marriage. TEX. FAM.CODE ANN. § 3.002 (Vernon 1998); *McClary v. Thompson,* 65 S.W.3d 829, 834 (Tex.App.-Fort Worth 2002, pet. denied). However, when separate property produces income, and that income is acquired by a spouse during marriage, it is community property. *McClary,* 65 S.W.3d at 834. Whatever is acquired during marriage by the talent, toil, or other measure of productivity of either spouse is community property. *Id.; Winger v. Pianka,* 831 S.W.2d 853, 857 (Tex.App.-Austin 1992, writ denied). Thus, any spouse's personal income during marriage is community property. *McClary,* 65 S.W.3d at 834; *Maben v. Maben,* 574 S.W.2d 229, 232 (Tex.Civ.App.-Fort Worth 1978, no writ).

"Generally, whether property is separate or community is determined by its character at inception." *Barnett v. Barnett,* 67 S.W.3d 107, 111 (Tex.2001). Inception occurs when a party first has a right of claim to the property, i.e., when title is finally vested. *McClary,* 65 S.W.3d at 834; *Smith v. Smith,* 22 S.W.3d 140, 145 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (op. on reh'g); *Winkle v. Winkle,* 951 S.W.2d 80, 88 (Tex.App.-Corpus Christi 1997, writ denied); *see also McCurdy v. McCurdy,* 372 S.W.2d 381, 383 (Tex.Civ. App.-Waco 1963, writ ref'd) (refusing to adopt apportionment formula to determine character of a life insurance policy as community or separate property, and, instead, holding that the inception-of-title rule applied). Thus, a spouse is not entitled to a percentage of his or her spouse's future income after divorce. *Smith v. Smith,* 836 S.W.2d 688, 692 (Tex.App.-Houston [1st Dist.] 1992, no pet.). A spouse is only entitled to a division of property that the community owns at the time of the divorce. *Id.*

Notwithstanding these principles, appellant cites multiple cases in support of the proposition that under Texas law, contingent interests in property constitute community property if the interests are acquired during marriage. However, these cases are distinguishable from the case at bar, because they all dealt with either unvested stock options or retirement benefits. *See Cearley v. Cearley,* 544 S.W.2d 661, 663–66 (Tex.1976), *abrogated by, Shanks v. Treadway,* 110 S.W.3d 444 (Tex.2003); *Busby v. Busby,* 457 S.W.2d 551, 552–54 (Tex.1970); *Boyd v. Boyd,* 67 S.W.3d 398, 410–11 (Tex.App.-Fort Worth 2002, no pet.) (all holding that pension/retirement benefits were community property and subject to division upon divorce); *see also Kline v. Kline,* 17 S.W.3d 445, 446 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *Charriere v. Charriere,* 7 S.W.3d 217, 219 (Tex.App.-Dallas 1999, no pet.); *Bodin v. Bodin,* 955 S.W.2d 380, 381 (Tex.App.-San Antonio 1997, no pet.) (all holding that unvested stock options were community property divisible upon divorce). We agree with appellant that Texas law is well settled regarding the characterization of retirement benefits and stock options as community property when they are accrued during marriage but paid after divorce. However, in the case at bar we are not dealing with either. Regardless, appellant makes an analogy to the above cases and argues that, under the present contract, the 2002 payments were fixed property rights subject to divestment only under certain circumstances. We disagree, and hold that appellee was required to perform his services as a skilled baseball player before

he was entitled to payment under the contract. Thus, the remaining payments under the contract constitute future earnings and as such are appellee's separate property except under the limited circumstance found by trial court, as discussed herein.

Other cases have characterized future earnings similarly. In *Cunningham v. Cunningham*, the appellate court affirmed the trial court's judgment denying the wife any community interest in commissions the husband received after the divorce, regardless of the fact that the commissions stemmed from insurance policies written by the husband during marriage. 183 S.W.2d 985, 986 (Tex.Civ.App.-Dallas 1944, no writ). The court reasoned that although the commissions related to services performed during marriage, the right to them did not accrue until the policies were renewed. *Id.* Moreover, the agency's employment contract dictated that the spouse would not be entitled to payment unless he remained in the active service of the company. *Id.* Therefore, the community estate had only a mere expectancy of the renewal commissions, not a vested right at the time of divorce. *Id.*

In *Butler v. Butler*, the court held that the wife was not entitled to an award of half the husband's future earnings from his psychological counseling business after the divorce. 975 S.W.2d 765, 768 (Tex. App.-Corpus Christi 1998, no pet.). There, the court awarded half of the fixtures, furniture, inventory, and all personal property associated with the husband's sole proprietorship to the wife as community property in the divorce. *Id.* However, the court held that the husband's future income, which would be derived from the husband's psychological counseling business after the divorce, was not property acquired *during* marriage. *Id.* Thus, the future earnings of the husband were his separate property. *Id.*

Appellant also cites *Licata v. Licata* to support the proposition that the character of personal earnings depends on when the earnings accrue, not when the earnings are received. 11 S.W.3d 269, 278–79 (Tex. App.-Houston [14th Dist.] 1999, no pet.). While we agree with this general statement of the law, we disagree with appellant's contention that appellee's right to payment under the contract accrued when he signed it, rather than when he performed his services.

 A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex.1992). To determine whether a condition precedent exists, the intention of the parties must be ascertained. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex.1990) (op. on reh'g). To determine the intent of the parties, we must look at the entire contract as a whole. *Id.; Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex.1983); *Gallup v. St. Paul Ins. Co.*, 515 S.W.2d 249, 251 (Tex.1974) (stating that the strongest indication of what a contract requires is determined by what its words plainly state). In order to make performance specifically conditional, a term such as "if", "provided that", "on condition that", or some similar phrase of conditional language must normally be included. *Criswell*, 792 S.W.2d at 948.

After a thorough review of the contract at issue, it is clear that it was the intent of the parties that appellee render skilled services as a baseball player in exchange for the payment of $5,800,000 for the year 2002. The contract's guarantee provision cannot be construed to excuse appellee from performance of his obligations under the contract. To the contrary, it existed to provide appellee with financial security in the event that appellee sustained an injury

or the ball club decided that his services were no longer needed. It did not excuse his performance under the contract. We hold that appellee's right to payment under the contract did not accrue until he performed his services. Therefore, the payments due under the contract after the date of divorce were correctly characterized as appellee's separate property and were not subject to divestment by the trial court except under the limited circumstances set out in the fact findings. Appellant's sole point is overruled.

## TEMPORARY ORDERS ON APPEAL

Appellee has filed a motion to modify the temporary orders that have remained pending during the course of the appeal. Because of our disposition of this cause on appeal, appellee's motion to modify is now moot. Therefore, we deny appellee's motion to modify.

## CONCLUSION

Having overruled appellant's sole point of error and denied appellee's motion to modify, we affirm the trial court's judgment in its entirety.