COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-376-CV

 

 

RAYMOND GLENN HANCOCK                                                APPELLANT

 

                                                   V.

 

VICKI B. HANCOCK                                                                APPELLEE

 

                                              ------------

 

           FROM THE 233RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Appellee
Vicki B. Hancock filed for divorce in August 2004, and after more than two years
of litigation, the trial court granted the divorce and signed the divorce
decree.  Appellant Raymond Glenn Hancock
filed a timely notice of appeal.  In
eight issues, Glenn complains of the trial court=s
property division.  Because we hold that
the trial court did not abuse its discretion in dividing the community estate,
we affirm the trial court=s judgment.

I.      Findings of Fact and Conclusions of Law

After
two days of trial, the trial court found:

. . .
. 

6.     Credible evidence was admitted to support
the following factors for consideration by the Court in ordering a division of
the parties= estate:

 

a.      GLENN=s[2]
fault in the breakup of the marriage;

 

b.     fraud on the community committed by GLENN;

 

c.      benefits VICKI may have derived from the
continuation of the marriage;

 

d.     disparity of earning power of GLENN and VICKI
and their ability to support themselves;

 

e.      earning power, business opportunities,
capacities, and abilities of both spouses; and

 

f.      wasting of community assets by GLENN.

 

7.     The community property of the parties
existing and remaining to be divided as of the date of the trial was valued as
follows:

 

a.      Property with an ascertainable cash value:

 








. . . 

Hancock Ins. Agency, Inc.     $170,520.00

. . .

. . . . 

 

8.     The total value of the community estate
existing on the day of trial was $1,727,842.89.

 

. . . . 

 

14.   GLENN committed fraud on the community and
waste of community assets during the pendency of the divorce proceeding by
improperly disposing of certain community property.

 

15.   Except for the fraud on the community and
waste committed by GLENN, the community property of the parties remaining to be
divided would have included the following additional cash assets:

 

Hancock Insurance Agency,
Inc. funds

expended
solely to benefit GLENN         $171,971.71

 

Retirement
funds withdrawn and expended 

solely to benefit GLENN                      $121,334.70

 

Cash from Ranch[[3]]                                       $36,000.00

 

Total                                                       $329,306.41

 

. . . .

 

 








17.   Therefore, in making a just and right
equitable division of the community estate, the Court considered the total
value of the community estate to be $2,105,549.30 ($1,727,842.89 + $329,306.41
+ $48,400.00 [cash advances the parties received from the receiver before
trial]).

 

. . . .

 

19.   VICKI was awarded [$1,227,178.06 in] existing
community property[.]

 

20.   VICKI received $26,600.00 in cash advances of
community property . . . . 

 

21.   VICKI thus received $1,253,778.06 of the
total community estate considered by the Court ($1,227,178.06 + $26,600.00).

 

22.   The percentage of existing community property
awarded to VICKI was 71% ($1,227,178.06/$1,727,842.89)[.] The percentage of the
total value of the community estate considered by the Court as awarded to VICKI
was 59.5% ($1,253,778.06/$2,105,549.30).

 

. . . . 

 

24.   GLENN was awarded [$500,664.83 in] existing
community property[.]

 

25.   GLENN received $22,000.00 in cash advances of
community property. . . . 

 

26.   Due to the fraud on the community and waste
committed by GLENN, the Court considered that GLENN also received [$329,306.41
in] advances of community property[.]

 

27.   GLENN thus received $851,971.24 of the total
community estate considered by the Court ($500,664.83 + $22,000.00 +
$329,306.41).








28.   The percentage of existing community property
awarded to GLENN was 29% ($500,664.83/1,727,842.89)[.] The percentage of the
total value of the community estate considered by the Court as awarded to GLENN
was 40.5% ($851,971.24/2,105,549.30).

 

The
trial court=s conclusions of law included
the following:

. . .
.

2.     The parties should be divorced on the
ground that the marriage had become insupportable because of discord or
conflict of personalities.

 

. . . .

 

4.     In determining the total value of the
community estate to be considered by the Court in making a just and right
equitable division of the community estate, the Court should recoup the amount
of community property lost to waste and/or constructive fraud committed by
GLENN.

 

5.     The value of the community property lost to
waste and/or constructive fraud committed by GLENN should be considered as part
of the total value of property awarded to GLENN.

 

II.     Preliminary
Matter:  Glenn=s Notebook

 








Initially,
we note that in presenting his issues, Glenn relies on information found in
Respondent=s Exhibit One, AGlenn
Hancock=s
Submission Notebook.@ 
Vicki contends that the notebook was admitted as a summary of the
witness=s
testimony and that its contents cannot be considered as admissible
evidence.  Rule 105(a) of the Texas Rules
of Evidence provides that A[w]hen
evidence which is admissible as to one party or for one purpose but not
admissible as to another party or for another purpose is admitted, the court,
upon request, shall restrict the evidence to its proper scope.@[4]  Evidence admitted for a limited purpose may
be considered for only that purpose.[5]  

Our
review of the record shows that the notebook was offered when the couple=s adult
son, Brad Hancock, was on the witness stand, after he had been sworn but before
he testified.  When asked if he had any
objections to the admission of the notebook, Vicki=s lawyer
replied,








Your Honor, in the
conference that we had at the bench a few minutes ago, I=m afraid this C and I don=t anticipate there are,
but if there is any settlement negotiations in here, I would object to
that.  And if this is being offered as a
summary of Mr. Hancock=s testimony, I don=t have any objections so
long as it=s restricted to a summary
C

 

The
trial court replied, AAdmitted as a summary of the witness=
testimony.@ 
Glenn=s attorney referred to the
notebook while questioning Brad.  Glenn
did not testify at trial.  Accordingly,
because the trial court admitted the notebook only as a summary of the witness=s
testimony, and the only Mr. Hancock who testified was Brad, we exclude the
notebook from our review of the evidence and exclude Glenn=s
arguments based on the notebook from our analysis.  Of course, to the extent that any specific
portion of the notebook was admitted into evidence without limitation elsewhere
during the trial, we will consider such portion.

III.     Standard of Review:  Division of a Community Estate

As this
court has previously explained,

In a divorce proceeding,
the trial court is charged with dividing the community estate in a Ajust and right@ manner, considering the
rights of both parties.  Trial courts are
afforded wide discretion in dividing marital property upon divorce;  therefore, a trial court=s property division may
not be disturbed on appeal unless the complaining party demonstrates from
evidence in the record that the division was so unjust and unfair as to
constitute an abuse of discretion. 

 








To determine whether a
trial court abused its discretion, we must decide whether the trial court acted
without reference to any guiding rules or principles; in other words, we must
decide whether the act was arbitrary or unreasonable.  We must indulge every reasonable presumption
in favor of the trial court=s proper exercise of discretion in dividing
marital property.  Accordingly, we will
reverse only if the record demonstrates that the trial court clearly abused its
discretion, and the error materially affected the just and right division of
the community estate.

 

. . .  In exercising its discretion, the trial court
must order an equitable, but not necessarily equal, division of the community
estate.  In dividing the estate, the trial
court can consider a variety of factors, and it is presumed that the trial
court exercised its discretion properly.[6]


 

IV.    The Trial Court=s
Division of the Hancocks=
Community Estate

In his
first issue, Glenn contends that the trial court made an unjust division of the
marital estate. 

A.     No Waste by Vicki








In his
seventh issue, Glenn contends that the trial court failed to take into account
money wasted by Vicki in making a just and right division of the marital
estate.  Our review of the admitted
evidence reveals that Brad testified that he had seen Aover 10
or 20" bundles of $100 bills before AY2K hit@ in the
parties= Crest
Lake home, that he did not recall when he last saw the money but it was at some
point before he was ordered to move in with his father in 2004, and that when
he last knew who had possession of the money, the person in possession was
Vicki.  Glenn does not refer to any other
admitted evidence.  The factfinder is the
sole judge of credibility of the witnesses.[7]
As factfinder, the trial court was in a better position to determine the
candor, demeanor, and credibility of the witnesses.[8]  We cannot say that the trial court abused its
discretion by implicitly finding that Vicki did not waste any of the community
estate.  We overrule Glenn=s
seventh issue.

B.     Value of Hancock Insurance Agency








In his
eighth issue, Glenn contends that the trial court erred by valuing Hancock
Insurance Agency at $170,520.00 when there was no evidence or factually
insufficient evidence to support that finding. 
Bryan Rice, whom the trial court appointed to evaluate the insurance
agency, testified on the first day of trial that his opinion as of that date,
July 17, 2006, was that the value of the insurance agency was approximately
$204,000.00 subject to a possible judgment of about $80,000.00.  He also testified that the projected renewals
of policies from August 1 through the end of the year was about $3.4 million in
gross premiums for the rest of the year. 
He estimated that ten percent of those renewal dollars, or $340,000.00,
would be the approximate agency revenue for the remainder of the year.  He testified that he used that percentage
rate because it was historical and that on average the rate ranged from 8 to 12
percent.  He also testified that in
constructing a current balance sheet for the agency, he considered Acash, a
check that=s receivable from the IRS, [and]
a small assessment for furniture and supplies,@ and
then he Asubtracted
from the total assets of [$]442,000 the liabilities of about $170,000.00 to get
to an unadjusted book value of about [$]272,000,@ and
then he Aassessed
a 25 percent discount for lack of marketability of the agency,@
reaching a net value of $204,099.00.  

More
than five weeks later, on the second day of trial, August 24, 2006, Bryan Rice
identified Petitioner=s Exhibit 9S2 as Aa
two-page document wherein [he] brought forward . . . the valuation of
the agency and more current numbers[,] taking into account more updated facts
and circumstances.@ 
The document summarizes his opinion as to the agency=s value
as of that date, August 24, 2006.  The
first page of the exhibit provides a computation ending in $170,520.00, labeled
as AAdjusted
Value?@ 
Rice explained how he arrived at the value,








I summed the assets of
the agency and future C or income to be earned
in the next C through the end of this
year and then deducted future expenses and liabilities to arrive at a net asset
value.  I subtracted a 25 percent
discount for lack of marketability on the net assets and came to a net value of
the agency.  And I also provided a C I=d say a hypothetical
calculation taking into account whether or not the contingent liability or the
liability related to the . . . building that . . . the
Hancock Insurance Agency vacated C there is . . . apparently, a judgment
against the corporation for unpaid rents, and there=s a question in my mind
as to whether that amount is actually going to ever be paid, so I provided the
Court a scenario if it=s going to be paid or if
it=s not going to be paid.

 

. . . .

 

. . . .  I would be the one to have made the payment
because I=m the Receiver for the
corporation, and I=ve not been served with
any type of document ordering me to pay the judgment.  I=ve not received any direction from any attorney
or court to pay the judgment.  

 

Rice
also explained that he considered future commissions in valuing the business

[b]ecause they
. . . represent likely benefits to be earned by this
. . . business in the very near future, within the next four
months or C so[.  T]hese commissions have a very lengthy
history of being earned year after year. 
As . . . I stated, there=s no guarantee that these commissions will be
earned, but I would say it=s probable that they will be earned.  

 

He also
testified that the 25% discount is a higher than normal discount for a
controlling interest, in his opinion.  








On
cross-examination, Rice admitted that there was no buyer for the agency at the
time and that he had not been approached by a potential buyer during his term
of receivership, which had lasted about eighteen months. Vicki testified that she believed that Glenn
had taken actions to diminish the value of the agency and had diverted business
from the agency.  As evidence, she
pointed to the fact that Glenn had transferred their personal homeowners=
insurance and auto insurance policies from the agency without her
knowledge.  She received a letter after
the fact from the insurance company stating that the agent of record (Glenn)
had been changed to another agency.  She
also testified that Glenn had, during the pendency of the divorce, set up two
other companies, Hancock Insurance & Associates and National Healthcare
Insurance Resources, to which he had diverted $300B$400,000.00,
receiving proceeds under a different business name that the trial court had
ordered the receiver to receive.  She
testified that she thought that this action also contributed to the decline or
the demise of the agency.  Further, she
testified that in her opinion, if Glenn had been doing all he could to improve
the value of the agency, it would be worth more than $204,000.00, and that
prior to the divorce, they had been offered 1.5 times the Abook@ of
business for the company.  At the time
she testified, that measure would have made the agency worth about
$600,000.00.  

Glenn=s
expert, Robert Martin, testified that the agency had approximately twelve large
accounts before receivership but only one as of the first day of trial and that
the diminution in value of the business since it had entered into receivership
was indicative of Glenn=s importance to the
business.  








Glenn
contends that Rice=s report is based on an
incorrect assumption that the agency will have a 100% renewal rate.  The evidence shows that Rice considered the
longevity of the accounts for which he projected renewals, the short term that would
elapse before the revenue would start rolling in, and the possibility that the
customers would not renew.  This
possibility also appears woven into the higher-than-usual 25% discount
rate.  Glenn=s
reliance on the lost profits analysis in Szczepanik v. First Southern Trust
Co.[9]
in arguing that there is no evidence as a matter of law of the agency=s value
is therefore misplaced.

Glenn
also complains that Rice failed to reduce the agency=s value
by a liquidated judgment of $61,387.00. 
Rice explained why he did not include that amount in his estimated value
of the company but also noted the amount on the report and his alternate estimate
behind it.








Glenn
additionally contends that Rice did not render an opinion that the value was
$170,520.00 but rather questioned whether that amount was the value.  Rice testified that the exhibit summarizes
his opinion as to the agency=s value
as of that date, August 24, 2006.  The
first page of the exhibit, which provides an estimate of the value ignoring the
alleged judgment against the company, provides a computation ending in
$170,520.00, labeled as AAdjusted Value?@.  We conclude that the evidence easily lends
itself to a conclusion that Rice opined that the estimated value of the company
on August 24, 2006 was $170,520.00.

Finally,
Glenn argues that the anticipated renewals should not have been included in the
value at all because they would not be earned or received until after the
divorce and thus were not themselves community property.  Because the business was the community asset
being valued, not the individual renewals, we cannot say that Rice improperly
considered the anticipated revenue in valuing the agency or that the trial
court abused its discretion by including the amount in its valuation of the
agency.  

As the
factfinder, the trial court was the sole judge of the credibility of witnesses
and the weight to be given to their testimony[10]
and could resolve any inconsistencies in the evidence.[11]  Based on the above discussion, we hold that
the trial court did not abuse its discretion by valuing the insurance agency at
$170,520.00.  We overrule Glenn=s eighth
issue.

C.     Fraud on the Community and Waste Supported
by Evidence








Apparently
as subissues to his global issue contending that the trial court abused its
discretion in dividing the community estate, Glenn contends that the evidence
is legally and factually insufficient to support the trial court=s
findings that he committed fraud on the community and wasted community
assets.       As
this court has previously explained,

The Texas Supreme Court
has recognized waste of community assets as a factor to be taken into
consideration in the division of the community estate. . . .

 

. . . .  A fiduciary duty exists between a husband and
a wife regarding the community property controlled by each spouse.  AFraud on the community@ is a judicially created
concept based on the theory of constructive fraud and is applied when there is
a breach of a legal or equitable duty, which violates this fiduciary
relationship existing between spouses. Although not actually fraudulent, any
such conduct in the marital relationship is termed fraud on the community
because it has all the consequences and legal effects of actual fraud since the
conduct tends to deceive the other spouse or violates marital confidences. 

 

A presumption of constructive fraud arises where one spouse breaches
the fiduciary duty owed to the other spouse and disposes of the other spouse=s one‑half
interest in community property without the other=s
knowledge or consent.  When that occurs,
the burden of proof is on the disposing spouse to show fairness in disposing of
community assets.[12]  








Waste of
community assets occurs when a spouse wrongfully depletes the community=s assets
without the other spouse=s knowledge or consent.[13]

The
trial court found that Glenn had committed fraud on the community and had
wasted community assets by improperly disposing of certain community property
during the pendency of the divorce. 
Specifically, the trial court found that Glenn had expended $171,971.71
of Hancock Insurance Agency, Inc. funds 
and $121,334.70 of retirement funds for his sole benefit.  Glenn had also disobeyed the trial court=s order
to deposit $36,000.00, cash on hand Aat the
ranch,@ into
the insurance agency account.  The trial
court found that, but for Glenn=s fraud
on the community and waste, the community estate would have been larger by
$329,306.41.

1.     The $171,971.71 in
Insurance Agency Funds








Glenn
contends that Vicki offered no evidence why the $171,971.71 in the insurance
agency=s funds
that the trial court found were expended solely to benefit Glenn were a waste
or fraud on the community.  Vicki
testified that Glenn paid himself the $171,971.71 from the insurance agency
without the trial court=s approval while there were
temporary orders in place Athat
said how much money@ each spouse was to
receive.  She answered affirmatively when
asked indirectly whether she Afelt
[those] were benefits that [Glenn] received that [she] didn=t
receive equal benefit from@ and
indicated that he was not authorized by the trial court to make them and that
she objected to them.  

The
accountant for the agency, Walter Virden, testified that the Hancocks had paid
bills out of the insurance agency that would generally get reclassified as
shareholder distributions; that he had had to make those kinds of adjustments Apretty
much the entire time@ Ctwenty-five
yearsCthat he
had been representing them; that in the past, even before the divorce, ranch
expenses had been paid out of the agency; and that Vicki=s
numbers did not account for any deposits that Glenn or Vicki might have made
into the agency.  When asked if he Anotice[d]
anything unusual or anything that would suggest that Glenn . . .
ha[d] personally benefitted from@ the
agency funds, Virden answered, AWell,
there=s a C no,
because here I can=t tell C like C well,
there=s a Dish
Net C Dish
Network (sic) for $35.25.  I don=t know
what that would be for.@ 
He answered, APerhaps, A when
asked whether Glenn had Aprobably personally benefit[t]ed@ from
that.  On cross-examination, Virden
stated that he did not know Awhether
[Glenn] did or . . . did not receive personal benefit@ from
the funds.  

Virden
testified,








The explanation for those
items would have been in the books of the company under various expense
categories.  And, also, there were items
of credits where money was paid back to the corporation either from Hancock
Insurance or from Mr. Hancock or Mrs. Hancock . . . [,] and those
credits are not reflected in these numbers.

 

He also
testified that a total of $114,000.00 in deposits had been made that were not
reflected in Vicki=s numbers.

The
burden was not on Vicki to justify the expenditures.  Because Vicki put on evidence that the money
was spent without her consent, it became Glenn=s burden
to show that the $171, 971.71 was expended fairly.[14]  Further, the trial court as the factfinder
was the sole judge of the credibility of the witnesses and the weight to be
given to their testimony[15]
and could resolve any inconsistencies in the evidence.[16]


2.     The Retirement Funds of
$121,334.70

Regarding
the withdrawn retirement funds of $121,334.70, Glenn also claimed that there
was no evidence or insufficient evidence to support the trial court=s
finding that he had wasted or committed fraud on the community.  Vicki testified that Glenn had withdrawn
$250,000.00 from the Southwest Securities retirement accounts.  Of that amount, $50,000.00 was sent directly
to the IRS.








Of the
remaining $200,000.00, Glenn used $100,000.00 to purchase a certificate of
deposit (CD).  The trial court admitted
an exhibit showing that Glenn received a cashier=s check
of $101,334.70 for the matured CD.  Glenn
deposited the check into the ranch account, receiving $90,000.00 in cash.  He testified at an earlier hearing that he
paid $75,000.00 in cash to his sister. 
There is no evidence regarding the remaining $15,000.00.  Vicki requested recoupment of the entire
amount of the matured CDC$101,334.70.  

Out of
the other $100,000.00, Vicki testified that seven or eight days after Glenn requested
a $50,000.00 distribution from Southwest Securities, he deposited $50,000.00
into an account at First State Bank. 
Glenn wrote some checks to himself and for ranch related expenses and
incurred other miscellaneous debits totaling approximately $20,000.00.[17]  Vicki sought recoupment of the
$20,000.00.  Glenn contends that the
entire $20,000.00 was for the payment of ranch expenses.  








Again,
it was not Vicki=s burden to prove that the
expenditures were unfair, but, once she challenged them, Glenn=s burden
to prove that they were fair.[18]  The trial court as the factfinder was the
sole judge of the credibility of the evidence[19]
and could harmonize it.[20]

3.     The
$36,000.00 Cash from Ranch

With
regard to the $36,000.00, Glenn contends that no evidence was admitted on this
issue.  Vicki testified as follows:

Q.     And then there was $36,000.00 that Mr. Hancock paid from the
First State Bank pursuant to C in his opinion, pursuant to a Court order; is
that correct?

 

A.     Yes.

 

Q.     What is your recollection of the $36,000.00 that Mr. Hancock was
to put into Hancock Insurance Agency?

 

A.     Well, during court, Judge Haddock had asked if he had any other
funds, any cash funds, anywhere.  She
said hidden under a rock or whatever. 
And he said yes, he did, he had $36,000.00 at the ranch in cash.  And she had ordered him to deposit that money
into the agency account the next morning C or by a certain C by 9:00 a.m., I believe.

 

Q.     So instead of taking $36,000.00 in cash from his ranch, he went
to the First State Bank and withdrew $36,000.00, correct?  

 

A.     Yes.

 

Q.     And he deposited that into Hancock Insurance Agency?

 

A.     Yes.

 








Q.     And that=s 36,000 of retirement
money, basically, right?

 

A.     Yes.

 

Q.     That=s C the money from C from Southwest
Securities went directly to First State Bank C 

 

A.     Uh-huh.

 

Q.     [I]s that right?

 

A.     Yes.

 

Petitioner=s
Exhibit 81 shows that Glenn made a $36,000.00 withdrawal from his First State
Bank account.  Vicki testified about it:

Q.     And is that the $36,000.00 . . . withdrawn by Mr.
Hancock and deposited into Hancock Insurance Agency?

 

A.     Yes.

 

Q.     . . . . Do you believe that this was the $36,000.00
Mr. Hancock was referring to that he had in cash?

 

A.     No.

 

Q.     Why is that?

 

A.     Well, because he=s writing a check on this account to deposit
it.  That=s not a cash deposit.

 








Vicki
asked for a recoupment of the $36,000.00. 
Glenn had the burden to prove that the disbursement of the $36,000.00
from the bank in lieu of the $36,000.00 in cash that he, by his own admission,
had at the ranch was fair,[21]
and the trial court was the sole judge of the credibility of the evidence and
the weight, if any, each item of evidence should have.[22]








Additionally,
the trial court=s file, which we presume the
trial court judicially noticed,[23]
shows that the trial court granted six different motions to compel discovery
filed by Vicki.  Among other things, the
trial court specifically found that Glenn had violated agreed interim temporary
orders dated August 27, 2004 by improperly cancelling Vicki=s health
insurance coverage, incurring indebtedness ($75,000.00) for purposes other than
legal expenses when he borrowed money from his sister, and withdrawing
$47,564.57 via cashier=s check and paying off the
entire balance of the debt on his 2004 Chevrolet motor vehicle.  The trial court also found that Glenn
violated temporary orders dated November 16, 2004 by failing to pay three months= spousal
support to Vicki; by withdrawing all proceeds ($101,334.70) of a CD and
misrepresenting or refusing to disclose to the trial court, or both, the
existence, amount, or location of the $101,334.70; by withdrawing $90,000.00 in
cash from his checking account; by transferring the sum of $75,000.00 to his
sister, and by withdrawing all proceeds ($56,845.96) of another CD.  

Based on
the above discussion, we hold that the trial court=s
findings that Glenn committed fraud on the community and wasted community
assets in the total amount of $329,306.41 are supported by legally and
factually sufficient evidence. 

D.     Benefits from Continuation
of the Marriage, Disparity of Earning Power, Business Opportunities,
Capabilities, and Abilities  Supported By
Evidence

 

Also
apparently as subissues to his contention that the division was unjust, Glenn
contends that Aabsolutely no evidence@ was
admitted as to any of the benefits that Vicki would have derived from the
continuation of the marriage and that A[t]he
only evidence of the disparity of earning power, business opportunities,
capabilities[,] and [the parties=]
ability to support themselves was in favor of Vicki,@ that
is, it portrayed Vicki as the person who was more financially capable.  

In fact,
the trial court heard evidence that

$                  
the last time Vicki had gainful employment other than self-employment
was approximately in 1976;

 

$                  
she had been out of the job market for approximately thirty years;

 

$                  
she had no current sources of income at the time of trial;








 

$                  
she had zero net resources at the time of trial;

 

$                  
she estimated that her health insurance would run $1,100.00B$1,500.00 per month and
that her monthly living expenses would run $11,840.21;

 

$                  
although she seemed somewhat knowledgeable and had some knowledge of
the accounts, she was of limited assistance in discovering the history of and
how the insurance agency works;

 

$                  
Glenn is covered by Medicare;

 

$                  
he started at least two other companies during the pendency of the
divorce;

 

$                  
he is a licensed insurance agent;

 

$                  
he was the only employee of the insurance agency on the first day of
trial and was primarily responsible for generating virtually all of the income
of the business, except a very small amount of casualty insurance;

 

$                  
the insurance agency had approximately twelve large accounts before
receivership and only one as of the first day of trial;

 

$                  
the diminution in value of the business since it entered receivership
was indicative of Glenn=s importance to the
business.

 

Based on
our review of the evidence before the trial court, who was the sole factfinder
and judge of the credibility of the witnesses and who could resolve the
inconsistencies in the evidence, we hold that the evidence was legally and
factually sufficient to support the trial court=s
implicit finding that the above factors weighed in favor of giving Vicki a
larger share of the community estate.








E.     No Evidence of Glenn=s Fault in the Breakup of
the Marriage,

But No Harm

 

In his
second issue, Glenn contends that the trial court erred by granting a
disproportionate award of the marital estate on the basis of fault when the
divorce was granted on the ground of insupportability.  In his third issue, Glenn contends that the
trial court erred by awarding a disproportionate share of the marital estate
when no evidence was admitted as to Glenn=s fault.
While we agree with Glenn that there is no evidence of Glenn=s fault
in the breakup of the marriage, the challenged finding of fact regarding fault
actually states, 

6.     Credible evidence was admitted to support
the following factors for consideration by the Court in ordering a
division of the parties= estate:

 

a.      GLENN=s fault in the breakup of
the marriage;

 

b.     fraud on the community committed by GLENN;

 

c.      benefits VICKI may have derived from the
continuation of the marriage;                                         

 

d.     disparity of earning power of GLENN and
VICKI and their ability to support themselves;

 

e.      earning power, business opportunities,
capacities, and abilities of both spouses; and

 

f.      wasting of community assets by GLENN. [Emphasis added.]

 








The
finding does not clearly state that the trial court considered fault as a
factor.  Further, the associated
conclusion of law provides, ABased on
the factors found by the Court, VICKI should receive a disproportionate share
of the parties= community property.@  Because neither the finding nor the
conclusion clearly and unambiguously provides that the trial court actually
considered Glenn=s fault in awarding the division
of property, we do not make that leap, indulging, as we must, Aevery
reasonable presumption in favor of the trial court=s proper
exercise of discretion in dividing marital property.@[24]

Further,
because the evidence otherwise supports the trial court=s
disproportionate division of property based on all the factors discussed above,
we hold that the erroneous finding that there was evidence of fault is  immaterial and harmless.[25]  We therefore overrule Glenn=s third
issue.  Because there was no evidence of
fault, we do not reach his second issue.[26]


F.      No Double Recovery by Vicki








In his
fourth issue, Glenn contends that the trial court erred in dividing the marital
estate by essentially granting Vicki a double recovery.  A review of the trial court=s
findings of fact and conclusions of law shows that the trial court awarded the
couple a 71/29% split of the existing community that would have been an
approximately 59.5/40.5% split absent Glenn=s fraud
on the community and waste and advances that they both received.  The findings also show that the trial court
relied on other factors besides waste and fraud in making the disproportionate
division, such as benefits that Vicki may have derived from the continuation of
the marriage, the disparity of earning power between Glenn and Vicki, and the
earning power, business opportunities, capacities, and abilities of both
spouses, all discussed above.  Because
the trial court=s findings show that the trial
court considered more than Glenn=s fraud
on the community and waste of the community assets in dividing the property, we
cannot say that the trial court awarded Vicki a double recovery or abused its
discretion.  No independent money
judgment was awarded here.  Glenn=s
reliance in this regard on Twyman v. Twyman[27]
and on our rejection of the wife=s
arguments seeking an additional judgment in Loaiza[28]
is thus misplaced.  We overrule Glenn=s fourth
issue.  

G.     Glenn Not Entitled to Fifty Percent of the
Amount He Wasted








In his
fifth issue, Glenn contends that the trial court erred by granting Vicki a
judgment for 100% of the alleged amount wasted by Glenn when she would only be
entitled to an award of fifty percent of the amount allegedly wasted.  The trial court did not award Vicki an
additional judgment.  Instead, the trial
court awarded Vicki a disproportionate share of the community estate based on
many factors, including Glenn=s
wasting of the community assets.  Additionally, we point out that contrary to
Glenn=s
assertion that Ahalf of those funds would have
been [his] in any event,@ the trial court has no duty to
divide a community estate, much less a specific asset, equally between the
parties upon divorce.[29]  We overrule Glenn=s fifth
issue.

H.     Division of Assets on Hand at the Time of
Trial

In his
sixth issue, Glenn contends that the trial court erred by dividing the
community estate based on assets not on hand at the time of trial.  The findings of fact given above show that
the trial court divided the assets on hand. 
The trial court=s explanation of how the assets
wasted and disposed of through Glenn=s fraud
on the community impacted the ultimate division does not replace the actual
division.  We overrule Glenn=s sixth
issue.

I.      The Trial Court=s
Division of the Hancocks= Estate
Not Unjust

Given
the above discussion, we hold that Glenn has not demonstrated that the trial
court abused its discretion in dividing the community estate.  We overrule his first issue.

V.     Conclusion








Having
overruled Glenn=s eight issues as well as his
subissues, we affirm the trial court=s
judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED:  July 31, 2008











[1]See Tex. R.
App. P. 47.4.





[2]The trial court referred to the parties by their full
names or initials in the findings of fact and conclusions of law.  In quoted excerpts from the findings of fact
and conclusions of law, we have modified these references by using only the
given names of the parties.





[3]A footnote here provided, ACash
GLENN advised Judge Haddock (Associate Judge of 233rd Judicial District Court)
GLENN had >at the ranch=; Judge Haddock ordered the cash be deposited in HIA
account; instead [he] withdrew $36,000 out of First State Bank account and
deposited in HIA[.]@





[4]Tex. R. Evid. 105(a).





[5]See Davis v. Gale, 160 Tex. 309, 330 S.W.2d 610, 612B13 (Tex. 1960) (holding that trustee=s deed
that plaintiffs introduced for limited purpose of demonstrating a cloud on
their title could not be used as proof of defendant=s title);
Tex. Commerce Bank Reagan v. Lebco Constructors, Inc., 865 S.W.2d 68, 76
(Tex. App.CCorpus Christi 1993, writ denied) (holding evidence
admitted for particular purpose may not be weighed in determining sufficiency of
evidence to show matter outside limitation), overruled on other grounds by
Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d
507, 530 (Tex. 1998); Fitzgerald v. LaFreniere, 658 S.W.2d 692, 696
(Tex. App.CCorpus Christi 1983) (holding document offered for
limited purpose of showing it had been given to party and never re‑offered
remained subject to limited tender and was no evidence of other fact sought to
be proved), rev=d on other grounds, 669 S.W.2d 117 (Tex. 1984); see also Peaster Indep. Sch. Dist. v.
Glodfelty, 63 S.W.3d 1, 10 (Tex. App.CFort Worth 2001, no pet.) (A[E]vidence
specifically offered only for a limited purpose remains subject to its limited
purpose; consequently, such evidence is simply not probative evidence of any
other fact.@).





[6]Schaban‑Maurer v.
Maurer‑Schaban, 238 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.) (citations omitted).





[7]Id. at 821B22.





[8]Id.





[9]883 S.W.2d 648, 650 (Tex. 1994).





[10]Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 





[11]McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986).





[12]Loaiza v. Loaiza, 130 S.W.3d 894, 900B01 (Tex. App.CFort Worth 2004, no pet.)
(citations omitted).





[13]Schlueter v. Schlueter, 975 S.W.2d 584, 589 (Tex. 1998).





[14]See Loaiza,
130 S.W.3d at 901.





[15]See Golden Eagle Archery, Inc., 116 S.W.3d at 761. 





[16]See McGalliard,
722 S.W.2d at 697.





[17]Petitioner=s exhibit 81 reveals that the actual total amount
withdrawn from the accountCincluding checks and other debitsCwas
$19,814.69.  Given the size of the
estate, the $185.31 discrepancy is immaterial.





[18]See Loaiza, 130 S.W.3d at 901.





[19]See Golden Eagle Archery, Inc., 116 S.W.3d at 761.





[20]See McGalliard,
722 S.W.2d at 697.





[21]See Loaiza,
130 S.W.3d at 901.





[22]See Golden Eagle Archery, Inc., 116 S.W.3d at 761; see also McGalliard,
722 S.W.2d at 697.





[23]See Tex. R. Evid. 201; Barnard v.
Barnard, 133 S.W.3d 782, 786 (Tex. App.CFort Worth 2004, pet. denied) (A[T]he trial court may
take judicial notice of its file at any stage of proceedings and is presumed to
have done so with or without a request from a party.@).





[24]Schaban‑Maurer, 238 S.W.3d at 820.





[25]See Tex. R. App. P. 44.1(a); Loaiza,
130 S.W.3d at 904.





[26]See Tex. R. App. P. 47.1.





[27]855 S.W.2d 619, 625 (Tex. 1993).





[28]130 S.W.3d at 900.





[29]See Tex. Fam. Code Ann. ' 7.001 (Vernon 2006); Osuna v. Quintana,

993 S.W.2d 201, 209 (Tex.
App.CCorpus Christi 1999, no
pet.).