# Supreme Court of Texas

No. 22-0787

In re J.Y.O., a Child

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued September 10, 2024**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The principal issue here is whether a discretionary bonus paid to a spouse after divorce for work performed during marriage is community property. Consistent with *Cearley v. Cearley*,[1] we hold that it is. Because the court of appeals ruled otherwise,[2] we reverse that part of its judgment.

We agree with the court of appeals that because the refinancing deed on the marital home naming wife as a grantee gave rise to the gift presumption, which was not rebutted, the trial court should have awarded husband and wife each an undivided one-half interest in the

---

[1] 544 S.W.2d 661 (Tex. 1976).

[2] 684 S.W.3d 796, 806 (Tex. App.—Dallas 2022).

home as tenants in common.[3] We affirm that part of the court of appeals' judgment.

Finally, we agree with the court of appeals that the trial court erred in its characterization and calculation of the 401(k) account.[4] We affirm that part of its judgment and remand to the trial court.

# I

Hakan and Lauren Oksuzler married in 2010. After a bench trial, the trial court granted them a divorce on December 9, 2019. But litigation continued relating to the division of the marital estate.

Hakan worked for Bank of America during the marriage. His compensation included an annual bonus of cash and stock, paid around February 15 each year, contingent on his and the Bank's performance during the previous calendar year.

Shortly after the divorce, Lauren filed a motion to have Hakan's 2019 bonus tendered to the registry of the court. The trial court held a hearing on February 12, 2020, a few days before the bonus was expected to be paid. Lauren called the hearing's sole witness, Andrea Laporta, the compensation executive for the Bank's consumer and small business department. He confirmed that Hakan would receive a bonus of $140,000—split between cash and equity—on February 15. Laporta further testified that:

- the bonus was based on Hakan's performance in 2019;
- the bonus amount was recommended by Hakan's manager in November 2019 and approved by the board of directors in January

---

[3] *See id.* at 803, 810.

[4] *See id.* at 807.

2

2020;

- the bonus is completely discretionary on the Bank's part—no employee is entitled to a bonus—as made "clear within all of the [Bank's performance] incentive [plan] documents"; and

- an employee is not entitled to receive a bonus if he is not employed by the Bank on the date of its distribution, regardless of whether the employee resigned or was fired.

In the decree, the trial court found that the bonus is Hakan's separate property.

The court of appeals agreed,[5] relying on our decision in *Loya v. Loya*.[6] The "central issue" in *Loya* was whether the performance bonus husband received in 2011 was partitioned by the parties' mediated settlement agreement in 2010.[7] Like Hakan, the husband in *Loya* "was eligible for, but not entitled to, an annual discretionary bonus."[8] During the marriage, husband received a bonus each spring for work performed during the previous calendar year. After wife filed for divorce, the parties agreed to a division of some assets, but disputes remained. The trial court ordered mediation, which resulted in a June 2010 agreement. The MSA expressly partitioned certain enumerated assets and then stated that "[a]ll future income of a party and/or from any property herein awarded to a party is partitioned to the person to whom the property is awarded".[9] The trial court rendered judgment on the MSA

---

[5] *Id.* at 805-806.

[6] 526 S.W.3d 448 (Tex. 2017).

[7] *Id.* at 449-450.

[8] *Id.* at 449.

[9] *Id.*

3

in June 2010, the day after it was executed.

Later, the parties disputed whether the MSA partitioned a $4.5 million bonus that husband received in March 2011 for work performed in 2010. The trial court granted summary judgment for husband on wife's petition for a post-divorce division of the bonus, but the court of appeals reversed and remanded.

We reversed the court of appeals' judgment and rendered judgment for husband.[10] We began by noting wife's reliance on "well-settled law"—specifically, our decision in *Cearley v. Cearley*—for her "argu[ment] that the bonus was community property because it compensated [husband] in part for services performed during the marriage."[11] We then said that "[w]hether the portion of a purely discretionary bonus based on services performed during the marriage constitutes community property is an important issue" but one we did not need to reach.[12] That was because the parties' dispute turned entirely on the language of the MSA, which awarded all of husband's "future income" to him. And to clarify the scope of our analysis, we added that "[w]hether the bonus qualifies as community property [did] not affect" our decision that the MSA resolved the parties' dispute.[13]

We then examined the meaning of "future income", which the MSA did not define. After surveying dictionary definitions, we concluded that "[t]he plain meaning of these terms clearly encompasses the 2011

---

[10] *Id.* at 453.

[11] *Id.* at 451.

[12] *Id.*

[13] *Id.*

4

bonus" because it was "an amount of money received by [husband] months into the future, after the divorce was final."[14] "[W]hether part of the bonus compensated for work done during marriage" was "irrelevant", we said, because we were interpreting the "broad" phrase specifically used in the MSA, "future income", rather than applying the default rules of community-property law.[15]

Even though the bonus' purpose was "irrelevant", we commented that "[t]he known terms of [husband's] employment . . . len[t] further context to our interpretation of the MSA."[16] We pointed to the evidence that payment of a bonus was at the discretion of husband's employer; that the board of husband's company decided on the bonus at a March 2011 meeting; and that, "[q]uite simply, when the parties signed the MSA in June 2010, no 2011 bonus existed."[17] "As such," we reasoned, "the purely discretionary bonus constitute[d] future income."[18]

## II

## A

The court of appeals here acknowledged our statements in *Loya* that "whether the bonus qualified as community property did not affect [our] determination"; that our decision was "based on the MSA"; and that we were leaving open the question "whether the portion of a purely discretionary bonus based on services performed during the marriage

---

[14] *Id.* at 452.

[15] *Id.*

[16] *Id.*

[17] *Id.* at 452-453.

[18] *Id.* at 453.

5

constitute[s] community property".[19] Nonetheless, the court pointed to our commentary on the discretionary nature and post-MSA timing of the bonus and said that it found this "dicta instructive."[20] Because Hakan's bonuses are "completely discretionary", "typically paid in February", and "contingent on the [Bank] board's approval and [Hakan's] continued employment", the court concluded that Lauren is not entitled to any part of the 2019 bonus.[21]

The court declined to apply our decision in *Cearley*—the case we identified in *Loya* as "well-settled law" bearing on the "important issue" we left open there.[22] In *Cearley*, the question was whether husband's military retirement benefits, which had not matured at the time of divorce, were part of the community estate.[23] The court of appeals here did "not find . . . [*Cearley*] to be of assistance to the facts of this case".[24] We disagree. *Cearley* is controlling.

In *Cearley*, husband served in the Air Force for nineteen years before divorce and all eighteen years of marriage. At the time of the June 1975 divorce, husband was on track to complete the twenty years' service necessary for receipt of retirement benefits in May 1976—about eleven months later. The trial court ruled that wife would receive half the retirement benefits attributable to eighteen years' service if and

---

[19] 684 S.W.3d at 805.

[20] *Id.*

[21] *Id.*

[22] *Loya*, 526 S.W.3d at 451.

[23] *See* 544 S.W.2d at 661-662.

[24] 684 S.W.3d at 806.

6

when husband retired. The court of civil appeals reversed. We reversed its judgment and reinstated the judgment of the trial court.[25]

We started with the "firmly established" law[26] "that matured private retirement, annuity, and pension benefits earned by either spouse during the marital relationship are part of the community estate and thus subject to division upon dissolution."[27] We had extended this rule to military retirement benefits in *Busby v. Busby*.[28] There, husband became eligible for retirement before the divorce and then retired shortly after the divorce. We "held that the retirement benefits . . . were community property at the time of the divorce" and should have been partitioned in the divorce decree.[29]

In *Cearley*, we observed that "the decisions in [Texas] and other community property States have differed as to whether the pension payments must have vested or matured before they are subject to apportionment by a divorce court".[30] Husband argued—backed by the decision below—that the *Busby* rule should not be extended to retirement benefits that are not "acquired or vested during the

---

[25] *Cearley*, 544 S.W.2d at 666.

[26] *Id.* at 663.

[27] *Id.* at 662 (collecting cases). In *Lee v. Lee*, 247 S.W. 828 (Tex. [Comm'n Op.] 1923), we jettisoned the "earlier view that retirement and pension plans [are] gifts bestowed by benevolent employers on retiring employees" and adopted the modern view "regard[ing] [these benefits] as a mode of employee compensation earned during a given period of employment." *Cearley*, 544 S.W.2d at 662 (discussing *Lee*, 247 S.W. at 833).

[28] 457 S.W.2d 551 (Tex. 1970).

[29] *Id.* at 554.

[30] 544 S.W.2d at 663.

7

marriage."[31] After assessing the caselaw from Texas and elsewhere, we rejected husband's approach.

"[M]ost of the objections to the[] treatment [of unaccrued and unmatured retirement benefits earned wholly or partially during marriage] as a contingent property interest were anticipated and answered . . . in [*Busby*]", we explained.[32] "[T]he husband there argued that he never possessed a property right in his disability retirement benefits during the marriage"; that the benefits "were a mere expectancy[] because he had not retired prior to the divorce"; and that his right to the benefits was "subject to forfeiture by death or dishonorable discharge prior to his retirement."[33] We "overruled" those arguments and "held [instead] that the benefits were community property at the time of the divorce even though they had not matured and were not at that time subject to possession and enjoyment."[34] Further, "the fact that the benefits were subject to divestment under certain conditions did not reduce [them] to a mere expectancy."[35] *Cearley* also pointed to our decision in *Herring v. Blakely*,[36] where we "held that profit sharing and retirement plans may be classed as community property even though none of the funds [are] available or

---

[31] *Id.* (quotation marks omitted).

[32] *Id.* at 665.

[33] *Id.* (quotation marks omitted).

[34] *Id.*

[35] *Id.* (quotation marks omitted).

[36] 385 S.W.2d 843 (Tex. 1965).

8

subject to possession at the time of the divorce."[37]

The takeaway from these authorities, we established in *Cearley*, is that a serviceman's military pension is not "earned" on the date of its maturity.[38] "Rather it is a form of deferred compensation which is earned during each month of his military service", and the portion earned during marriage becomes "contingent earnings of the community which may or may not bloom into full maturity at some future date."[39] Accordingly, we held that a serviceman's pension "rights, prior to accrual and maturity, constitute a contingent interest in property and a community asset subject to consideration along with other property in the division of the [marital] estate".[40]

## B

Hakan contends that the *Loya* MSA divided the community estate as of the date of the agreement and so our classification of husband's bonus as future income equates to deeming it separate property. Hakan misreads *Loya*. The MSA did not purport to partition, as a broad category, everything that would be considered community property under Texas law. Rather, as our opinion recounts, "[t]he MSA explicitly partitioned numerous bank accounts, retirement plans, motor vehicles, furnishings, jewelry, antiques, household items, and liabilities" to one spouse or the other.[41] Indeed, as the parties stipulated, the last bonus

---

[37] *Cearley*, 544 S.W.2d at 665.

[38] *Id.*

[39] *Id.* at 665-666.

[40] *Id.* at 666.

[41] *Loya*, 526 S.W.3d at 449.

9

husband received during the marriage was deposited into a bank account partitioned to wife.[42]

Hakan further argues that *Cearley* and *Busby* do not apply because "retirement benefits are completely different than a discretionary bonus." To the contrary, we see no meaningful distinction in this context. Both are forms of compensation.[43] *Cearley* teaches that the key question is when the compensation is earned, not when all contingencies for payment have been met.[44] And the record establishes that the bonus Hakan received in February 2020 was compensation for his performance in 2019, when he was still married. At the hearing, Bank representative Laporta answered "yes" when asked whether the bonus is "based on work that [Hakan] performed during the 2019 fiscal year". Laporta also testified that the amount of the bonus "is essentially a decision made by Hakan's manager during the enterprise year-end compensation process." Hakan's continued employment on the date of payment was merely a contingency that had to be met before the payment was made.

In *Loya*, we did not make it a point to expressly reserve "an important issue"[45] and nonetheless go on to implicitly decide it. *Loya* is inconsequential to this case because it addressed a different question.

---

[42] *Id.*

[43] *See* TEX. FAM. CODE § 7.003 ("In a decree of divorce or annulment, the court shall determine the rights of both spouses in a pension, retirement plan, annuity, individual retirement account, employee stock option plan, stock option, or . . . bonus . . . .").

[44] *See* 544 S.W.2d at 665-666.

[45] 526 S.W.3d at 451.

10

Consistent with *Cearley* and *Busby*, we hold that the characterization of a bonus—like any compensation—depends on when it was earned and that a discretionary bonus paid after divorce for work performed during marriage is community property. The opposite rule would promote gamesmanship by a bonus-earning spouse who can orchestrate deferring the bonus' payment until after divorce. The trial court erred by characterizing the bonus paid in February 2020 as Hakan's separate property, and the court of appeals erred in its judgment that this was not an abuse of discretion.[46]

## III

Hakan challenges the court of appeals' decision reversing the trial

---

[46] Hakan relies on *Cunningham v. Cunningham*, 183 S.W.2d 985 (Tex. Civ. App.—Dallas 1944, no writ), and *Loaiza v. Loaiza,* 130 S.W.3d 894 (Tex. App.—Fort Worth 2004, no pet.). The latter was cited by the court of appeals below. 684 S.W.3d at 805. In *Cunningham*, wife argued that husband's expected commissions for insurance policies sold by husband during the marriage should be characterized as community property. The court of civil appeals disagreed, reasoning that because the commissions were contingent on future events, including husband's "remain[ing] in the active service of the company", "the right of the community estate . . . to these renewal commissions is not a vested right, but a mere expectancy." *Cunningham*, 183 S.W.2d at 986. In *Loaiza*, the court relied on *Cunningham* to hold that husband's post-divorce payments under a "guaranteed" Major League Baseball contract signed during marriage "constitute[d] future earnings" and thus were husband's separate property. *Loaiza*, 130 S.W.3d at 906, 909.

*Cunningham* was decided three decades before *Busby* and *Cearley* and appears to be inconsistent with those cases and with our holding here. *Loaiza* may also be distinguishable because husband's "guaranteed" contract provided that the club was not obligated to continue payments if husband refused to render services, *id.* at 906, and the court of appeals held that he "was required to perform his services as a skilled baseball player before he was entitled to payment under the contract", *id.* at 908-909. In that way, specifically, the contract payments may have been functionally similar to the paycheck received by any ordinary employee.

court's award to Hakan of 100% of the marital residence as his separate property.

**A**

Five years before marrying Lauren, Hakan purchased the home the parties lived in throughout their marriage. Hakan refinanced the home during marriage in 2016. The general warranty deed lists both Hakan and Lauren as the grantors and the grantees:

> Hakan Oksuzler, joined herein by his wife, Lauren M Oksuzler[,] hereinafter called 'Grantor,' . . . for and in consideration of the sum of zero dollars ($0.00) cash, and other good and valuable consideration . . . paid to Grantor by Hakan A Oksuzler and Lauren M Oksuzler, Husband and Wife, hereinafter called Grantee, . . . does hereby grant, sell, and convey unto Grantee, the real property described as follows . . . .

The parties simultaneously executed a deed of trust that defined "borrower" as "Hakan Oksuzler and Lauren Oksuzler, Husband and Wife", and made them jointly obligated to pay the mortgage.

Lauren testified at trial that she and Hakan had conversations about ownership of the home. Lauren said that because Hakan owned the home prior to marriage, she "just never felt like it was [their] home and [she] expressed those concerns to Hakan." Lauren preferred that they buy another home together, but Hakan did not want to move. But, Lauren testified, Hakan "assured [her] that he was going to take care of it and make sure that [she] knew that it was [her] home." According to Lauren, Hakan "said he was going to gift [her] part of the house and put [her] name on the deed and just give [her] that security." Then, to make the house jointly owned, they "put the home under both of [their] names and refinanced." When asked whether she paid Hakan money "for the

12

interest he gave [her] in the house", Lauren responded: "No. It was a gift."

Hakan testified that he noticed Lauren's name listed as both a grantor and a grantee on the deed but that she never owned the property. He said that the inclusion of her name was "strange" to him, and he answered "yes" when asked whether he was "concern[ed] that there may have been some confusion down at the title office". But Hakan never testified that he did not intend to gift Lauren an interest in the home.

The trial court characterized the home as Hakan's separate property. The court of appeals reversed and rendered judgment that Hakan and Lauren each own as separate property an undivided one-half interest in the home.[47] The court began with the principle recognized in Texas caselaw that when one spouse conveys real property to the other, there is a presumption that the conveyance is a gift to the grantee spouse.[48] The court then explained that Hakan simply "failed to present any evidence rebutting the presumption he gifted one half of the marital residence to [Lauren]."[49] Specifically, Hakan "never asserted his lack of intent to gift her the property, only that it was 'strange' she was on the deed."[50] The court thus held that "the trial court had insufficient

---

[47] 684 S.W.3d at 800, 803.

[48] *See id.* at 802 ("[R]eal property gifted by one spouse to another during marriage is the recipient spouse's separate property." (citing TEX. CONST. art. XVI, § 15)).

[49] *Id.* at 803.

[50] *Id.*

13

evidence upon which to exercise its discretion", and "it erred in its application of that discretion."[51]

## B

Texas caselaw has recognized multiple fact patterns involving a real property deed that result in what courts have termed a "gift presumption".[52] The most basic scenario is when a married couple lives

[51] *Id.*

[52] Some caselaw also discusses a "separate property presumption" that "arises when the conveying instrument contains a separate property recital." *In re Marriage of Crist*, 661 S.W.3d 623, 627 (Tex. App.—El Paso 2023, no pet.); *see also Roberts v. Roberts*, 999 S.W.2d 424, 432 (Tex. App.—El Paso 1999, no pet.) ("Presumptions of separate property also arise where . . . the instrument of conveyance contains a 'separate property recital.'").

The leading case is our decision in *Henry S. Miller Co. v. Evans*, 452 S.W.2d 426 (Tex. 1970). During marriage, wife purchased property on Amanda Street with a mortgage. The deed recited that the consideration was "paid out of [wife's] 'sole and separate estate[]' and that [the] property was conveyed to her as her 'sole and separate estate.'" *Id.* at 429. Later, husband defaulted on a note to Henry S. Miller Co., which eventually sued the sheriff for failing to levy execution on the Amanda Street property. The question before us was whether that property was wife's separate property or, because it was purchased during marriage, part of the community estate and therefore subject to community debts. *See id.* at 430. We explained that "[a]s a result of the recitals in the deed, no presumption of community property existed." *Id.* Rather, the recitals were prima facie evidence that the Amanda Street property became wife's separate property, even against creditors of husband or the community. *See id.* at 431 (discussing *Kahn v. Kahn*, 58 S.W. 825, 826 (Tex. 1900)). We went on to examine when parol evidence is admissible to contradict an express separate property recital in a deed. *See id.* at 431-433.

Hakan argues that the 2016 refinance deed does not create any presumption of a separate-property gift to Lauren because it fails to contain a separate-property recital. But *Henry S. Miller* does not apply here. The rule established there is that a separate-property recital can overcome the community-property presumption that would otherwise apply when one spouse purchases property during marriage. The absence of a

14

in a home purchased by one spouse before marriage, and the owner spouse executes a deed conveying an undivided one-half interest in the property to the other spouse.[53] A variation is when the couple refinances the marital home acquired by one spouse before marriage, and the new deed lists both spouses as grantees.[54] In each of these scenarios, a "presumption is raised that the [owner] spouse intended to give the other spouse an undivided one-half interest in the property as a gift."[55]

The leading case from this Court is *Cockerham v. Cockerham*.[56] There, before marriage, husband and his brother each owned an undivided one-half interest in a 320-acre tract of land on which they conducted farming operations.[57] After he married, husband wanted to buy out his brother but needed a loan. Husband and brother consulted a lawyer, who filed a partition suit on husband's behalf. The trial court appointed a receiver, who sold the tract to husband and his wife. The receiver's deed listed both husband and wife as grantees.[58] The deed also reflected a total consideration of $22,700, about half of which was said to have been paid by husband and wife in cash, with the remainder

separate-property recital does not affect the presumption that property conveyed from one spouse to another during marriage is a gift that becomes the recipient's separate property.

[53] *See Raymond v. Raymond*, 190 S.W.3d 77, 79 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see also Roberts*, 999 S.W.2d at 431.

[54] *See Marriage of Crist*, 661 S.W.3d at 625-626.

[55] *Raymond*, 190 S.W.3d at 81.

[56] 527 S.W.2d 162 (Tex. 1975).

[57] *Id.* at 166-167.

[58] *Id.* at 167.

paid in cash by a bank that received a vendor's lien.[59] "It was undisputed, however, that [husband and wife] actually made no cash payment at all" and that the amount they were said to have paid was the value of husband's undivided one-half interest in the property.[60]

When the parties later sued each other for divorce, wife's bankruptcy trustee intervened, seeking to require the payment of debts from the community estate before its division.[61] The lower courts concluded that there was a tenancy in common between husband's one-half separate property interest that he owned before marriage and the remaining one-half interest purchased by the community.[62] We affirmed.[63]

The trustee first argued that the entire 320-acre tract was community property.[64] We rejected that contention, reasoning that the facts surrounding the transaction were sufficient to justify the trial court's findings that husband "put up the interest he owned prior to marriage as partial consideration for the purchase" and that the

---

[59] *Id.*

[60] *Id.*

[61] *Id.* at 164.

[62] *Id.* at 167.

[63] *See id.* at 168. The *Cockerham* transaction differs from the conveyance and refinance scenarios described above because its net effect was that the Cockerhams purchased a new property interest (brother's one-half interest) during marriage. Thus, brother's one-half interest became part of the Cockerhams' community estate.

[64] *Id.* at 166.

"undivided one-half interest remained his separate property."[65]

The trustee argued in the alternative that even if husband retained a separate property interest in the tract, the partition transaction resulted in a gift from husband to wife of an undivided one-half interest in his separate property—making the gifted interest eligible to pay wife's debts.[66] The trustee relied on the "well established" rule that "when a husband uses separate property consideration to pay for land acquired during the marriage and takes title to the land in the name of husband and wife, it is presumed he intended the interest placed in his wife to be a gift."[67] We acknowledged the presumption but said that it "can be rebutted by evidence clearly establishing there was no intention to make a gift."[68]

And that is what happened in *Cockerham*. Wife testified that "she never paid any attention to the purchase of the 320 acres" and that "she never even saw the deed to the property until the preparation for . . . litigation."[69] There was evidence that wife's "attitude toward the 320-acre tract ha[d], until [then], been largely one of complete disinterest".[70] Furthermore, wife "offered no testimony in support of the presumption that her husband meant to make a gift to her of part of his interest in the 320-acre tract", and there was "nothing in her testimony

---

[65] *Id.* at 167.

[66] *Id.* at 167-168.

[67] *Id.* at 168 (collecting cases).

[68] *Id.* (collecting cases).

[69] *Id.*

[70] *Id.*

which would indicate any understanding that a gift had been made to her."[71]

Husband's testimony "also tend[ed] to negate any idea that he intended a gift [of his separate property] to his wife."[72] Husband testified that "[t]he structure of the transaction whereby he bought his brother's interest . . . was of no concern to him" and that "he left the transaction entirely to his lawyer."[73] Brother "corroborated the testimony that the purchase was structured as it was solely to enable the husband to buy the property."[74]

Based on this evidence and the findings issued by the trial court, we said the court had "impliedly found that the presumption the husband intended a gift to the wife was sufficiently rebutted and that, in fact, there was no such intention."[75] "Considering the record before us," we were "unable to say there [was] no evidence to uphold [this] implied finding".[76] We thus held that husband had "sufficiently rebutted the presumption which arises from the fact that title was taken in the name of himself and his wife".[77]

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

## C

Hakan argues that under *Cockerham*, the gift presumption can be rebutted by evidence that a gift was not intended. Hakan points to a court of appeals decision, *Raymond v. Raymond*, which distinguished between a case like *Cockerham*—where one party uses separate property to purchase real estate during marriage, and both spouses' names appear as grantees on the deed from that sale—and a case where one party owned the property before marriage and then executes a deed during marriage conveying the property to the other spouse as the sole grantee.[78] The *Raymond* court observed that in the former case, the gift presumption can be rebutted by evidence that a gift was not intended,[79] but it held that in the latter case, parol evidence is not admissible unless the spouse challenging the deed "first tender[s] evidence of fraud, accident, or mistake" or the court finds "a latent or patent ambiguity."[80] Some courts have declined to follow *Raymond*.[81]

The distinction drawn by the *Raymond* court is incorrect.

---

[78] *See Raymond*, 190 S.W.3d at 81.

[79] *See id.*

[80] *Id.*

[81] *See Stearns v. Martens*, 476 S.W.3d 541, 548 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("[W]e agree with the body of cases in which courts of appeals hold that, if the instrument contains no separate-property recitals, then parol evidence is admissible regarding the marital-property issue." (citing *Raymond* as going the other way)). *But see Magness v. Magness*, 241 S.W.3d 910, 912-913 (Tex. App.—Dallas 2007, pet. denied) (citing *Raymond* for the rule that the gift "presumption may be rebutted by proof the deed was procured by fraud, accident, or mistake" and affirming the trial court's conclusion that wife "did not establish fraud, accident, or mistake in the execution of the [refinancing] deed").

*Raymond* relied in part on our opinion in *Henry S. Miller Co. v. Evans*.[82] At issue there was the characterization of property conveyed by a deed containing separate-property recitals. We stated our agreement with the court of civil appeals "that the extrinsic evidence offered to contradict the *express recitals* in the deed that the property was to be the separate property of [wife] was inadmissible."[83] We said that husband's creditor "was unable to introduce extrinsic evidence", such as evidence about the "subjective intention of the parties", to "contradict the *express recitals* in the deed . . . without first tendering competent evidence that there had been fraud, accident and mistake *in the insertion of the recitals in the deed*."[84] And we held that based on the record, "[t]here was no fraud, accident or mistake *in the insertion of these recitals in the deed*."[85] We went on to define fraud, accident, and mistake and to discuss what kind of evidence is necessary to meet those standards.[86]

*Cockerham* was decided five years after *Henry S. Miller*. *Cockerham* did not involve a separate-property recital but rather a deed naming both husband and wife as grantees.[87] In *Cockerham*, we did not cite *Henry S. Miller*. We cited many other authorities for the rule that when the gift presumption arises because "title to the land [is taken] in

---

[82] *Raymond*, 190 S.W.3d at 81 (citing, among other authorities, *Henry S. Miller*, 452 S.W.2d at 431-432).

[83] *Henry S. Miller*, 452 S.W.2d at 431 (emphasis added).

[84] *Id.* (emphases added).

[85] *Id.* (emphasis added).

[86] *See id.* at 431-432.

[87] *See* 527 S.W.2d at 167.

the name of husband and wife", the presumption can be rebutted by evidence that no gift was intended.[88] Taken together, these cases establish that the rule against parol evidence we applied in *Henry S. Miller* is limited to cases where there is an express separate-property recital in the deed.

## D

We turn to the issue whether Hakan presented clear-and-convincing evidence to rebut the presumption that he intended to gift Lauren an undivided one-half interest in the marital home as her separate property. Consistent with *Cockerham*, the court of appeals considered all the evidence that Hakan presented and held that he had not presented "any evidence rebutting the presumption".[89] We agree that Hakan did not rebut the gift presumption and that, therefore, the trial court abused its discretion by awarding 100% of the marital residence to Hakan as his separate property.

Hakan argues that the following facts and evidence are sufficient to support the trial court's property characterization:

- his testimony that he thought it was "strange" that the deed names Lauren as a grantee;
- the deed's incorrectly naming Lauren as a grantor, when it is undisputed she had no interest to grant before the refinancing;
- the deed's arising from a refinancing; and
- "the fact that neither party was an attorney with knowledge of gift presumptions".

We disagree. To overcome the gift presumption, Hakan was required to

---

[88] *Id.* at 168.

[89] 684 S.W.3d at 803.

put on evidence "*clearly establishing* there was no intention to make a gift."[90] *Cockerham* shows what kind of evidence can meet this standard.[91] Hakan's evidence falls far short.[92] Consistent with the presumption, Lauren testified that Hakan "said he was going to gift [her] part of the house and put [her] name on the deed" to give her financial and emotional security and that the purpose of the refinance transaction was to accomplish that gift. Hakan did not address, much less dispute, Lauren's testimony in any way—even during the colloquy in which he described the deed as "strange". In fact, Hakan did not testify about his intentions for refinancing at all. Further, we agree with Lauren that the deed's error naming her as a grantor is not evidence

---

[90] *Cockerham*, 527 S.W.2d at 168 (emphasis added).

[91] *See id.*; *see also Marriage of Crist*, 661 S.W.3d at 629 (affirming the trial court's finding that wife overcame the gift presumption by testifying that she never intended to gift an interest in her home to husband and that she only intended to refinance the home to pay off debts, despite husband's conflicting testimony).

[92] Hakan argues that the abuse-of-discretion standard mirrors the legal-sufficiency standard and that, therefore, a trial court's property characterization can be reversed on appeal only if there is legally insufficient evidence to support it. Hakan cites *Bradshaw v. Bradshaw*, which is inapposite. *See* 555 S.W.3d 539, 543 (Tex. 2018) (stating merely that whether the trial court abused its discretion in dividing the community estate is a "legal question" for the appellate court). As the court of appeals recognized: "In family law cases, the traditional sufficiency standard of review overlaps with the abuse of discretion standard of review; therefore, legal and factual insufficiency are not independent grounds of error but are relevant factors in [an appellate court's] assessment of whether the trial court abused its discretion." 684 S.W.3d at 802 (citing *Sink v. Sink*, 364 S.W.3d 340, 343 (Tex. App.—Dallas 2012, no pet.)). Furthermore, the standard Hakan proposes would make no difference in this case because the court of appeals found Hakan's evidence to be legally insufficient, not factually insufficient. *See id.* at 803.

rebutting Hakan's subjective intent to gift her half the home as a *grantee*.

We thus affirm the part of the court of appeals' judgment that awards Hakan and Lauren each as tenants in common an undivided one-half interest in the home.

## IV

Hakan also challenges the court of appeals' judgment reversing the trial court's characterization of the majority of funds in a 401(k) account as Hakan's separate property.

## A

Hakan began working at the Bank in 2002. As part of his compensation, Hakan participated in a defined-contribution retirement plan. Both Hakan and the Bank made contributions to a 401(k) account beginning before Hakan's 2010 marriage to Lauren. At trial, Lauren introduced evidence that Hakan contributed $20,648.23 between 2005 and 2010 to an account held by Fidelity, but there is no evidence what the balance of this account was at the time of marriage or what contributions were made between 2002 and 2005.

In 2015, during marriage, and while still employed by the Bank, Hakan opened a new 401(k) account with Merrill Lynch with an initial deposit of $124,323.36. This is the account at issue here. Hakan introduced pay stubs from 2012 to 2018 reflecting that he had made contributions totaling $62,042.77 to the two consecutive 401(k) accounts during marriage.[93] At the time of divorce, the balance of Hakan's Merrill

---

[93] Pay stubs for the first two years of marriage, 2010 to 2012, were not offered into evidence.

Lynch 401(k), including employer contributions and investment returns, had increased to $353,091.43.

The trial court found that "[p]rior to the marriage, total contributions made by [Hakan] to his Bank of America 401(k), plus any gains and losses on those contributions, totaled approximately $311,778.24 as of December 9, 2019." The court did not explain the calculation used to arrive at that number.

The court of appeals rejected the trial court's math and methodology. The court explained that Hakan did not meet his burden to "trac[e] the character of the funds deposited in 2015."[94] "It was not enough to show that the $124,323.36 deposit could have been separate funds and could have included the $20,648.23 from the retirement account [Hakan] had prior to marriage", the court explained.[95] The court thus held that Hakan "failed to overcome the community property presumption with legally sufficient evidence" and that "[t]o the extent that the trial court simply took the value of the account on the date of divorce, subtracted [Hakan's] contributions during marriage and then awarded the remaining $311,778.24 as his separate property, the trial court abused its discretion in its characterization and division of the property."[96] The court further concluded that this "abuse of discretion affected the just and right division of the community estate".[97] The court reversed and remanded "for the trial court to reconsider division of the

[94] 684 S.W.3d at 807.

[95] *Id.*

[96] *Id.*

[97] *Id.*

community estate."[98]

## B

A 401(k),[99] a type of defined-contribution plan, allows an employee to elect to defer a portion of earned wages by placing them into a retirement account, which in turn can hold investments of those earnings.[100] The account is held by the employee.[101] With a traditional account, as here, the deferral and any gains on investment are not subject to federal income tax until they are distributed and 100% vested.[102] Employers may also contribute to these accounts on behalf of their employees or match employees' elective deferrals.[103] The IRS limits the amount of compensation that may be deferred each year.[104]

---

[98] *Id.*

[99] *See* 26 U.S.C. § 401(k).

[100] *See Shanks v. Treadway*, 110 S.W.3d 444, 445 n.1 (Tex. 2003) ("A defined contribution plan . . . is funded by contributions of a specified amount that are invested or placed in a trust fund, and the employee is entitled upon retirement to those contributions plus the earnings thereon.").

[101] 26 U.S.C. § 401(k)(2).

[102] *401(k) Plan Overview*, IRS (Aug. 2, 2024), https://www.irs.gov/retirement-plans/plan-participant-employee/401k-resource-guide-plan-participants-401k-plan-overview. There are also Roth 401(k) plans, which do not defer taxes on the amount contributed, but under current law, gains on those amounts are not subject to taxation upon withdrawal. *Id.* More than one third of working-age Americans had retirement savings in a 401(k), 403(b), or 503(b) account in 2020. Maria G. Hoffman, et al., *Who Has Retirement Accounts?*, U.S. CENSUS BUREAU (Aug. 31, 2022), https://www.census.gov/library/stories/2022/08/who-has-retirement-accounts.html.

[103] *401(k) Plan Overview*, *supra*, note 102.

[104] 26 U.S.C. § 402(g).

25

A 401(k) account possessed during marriage is presumed community property incident to employment during marriage.[105] However, the Family Code provides that "[t]he separate property interest of a spouse in a defined contribution retirement plan may be traced using the tracing and characterization principles that apply to a nonretirement asset."[106] Any contributions made to the 401(k) before marriage, along with any investment return attributable to the separate contribution, is separate property if proved by clear-and-convincing evidence.[107] Litigants may trace separate property through documentary evidence, including bank or business records[108] or, as here, may prove contribution amounts with pay stubs. Expert

---

[105] *See* TEX. FAM. CODE § 3.003(a); *see also Cearley*, 544 S.W.2d at 662.

[106] TEX. FAM. CODE § 3.007(c). This treatment is in keeping with the distribution of defined-contribution plans in other community-property states. In Louisiana, defined-contribution plans are distributed during divorce in proportion to the contributions made during the marriage. *Sims v. Sims*, 358 So. 2d 919, 923 n.5 (La. 1978). In Idaho, a defined-contribution plan is similarly distributed in accordance with evidence showing contributions and accrual during the marriage. *Maslen v. Maslen*, 822 P.2d 982, 986-988 (Idaho 1991).

[107] *See* TEX. FAM. CODE § 3.003(b); *see also* BRETT R. TURNER, Equitable Distribution of Property § 6:24 (4th ed. 2024) ("The marital interest includes contributions from marital funds and contributions made by the employer as compensation for marital efforts, plus passive investment return. The separate interest includes contributions from separate funds, as well as contribution made by the employer as consideration for premarital or postdivorce efforts, plus passive investment return.").

[108] *See McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973) (referring to bank records to determine the character of particular assets including savings certificates); *see also Vallone v. Vallone*, 644 S.W.2d 455, 464 & n.8 (Tex. 1982) (Sondock, J., dissenting) (citing cases in which accurate bookkeeping or detailed business records facilitated tracing of separate property).

testimony, including summaries or models, may establish account balances and allocate gains on invested contributions made before and during marriage.[109] The employee spouse is competent to testify regarding the details of his employment and any history of contributions.[110]

## C

Hakan's 401(k) includes contributions from his wages earned during marriage and, thus, the account is presumptively community property. Any separate property within the account must be traced to contributions made before marriage. A transfer of $124,323.36 from the existing Fidelity 401(k) to open the Merrill Lynch 401(k) in 2015 is insufficient to establish that the entire amount was his separate property. To the extent that the trial court deemed the $62,042.77 contributed during marriage community property and awarded the remaining $311,778.24 to Hakan as separate property, it lacked legally sufficient evidence to do so. The only separate property Hakan can trace is $20,648.23 contributed to the Fidelity 401(k) before marriage. Hakan did not prove that $311,778.24 came from contributions before marriage; nor did he separate the earnings on his premarriage contributions from investment gains on contributions made during marriage.

The trial court's calculation is infirm for two reasons. First,

_____

[109] *See Kelly v. Kelly*, 634 S.W.3d 335, 351-352 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding that a spouse could trace separate property in a 401(k) with expert witness testimony demonstrating the balance of the account at marriage, even though original account statements were no longer available).

[110] *See id.* at 351.

account funds not traced to either separate or community contributions are presumed to be community property. Hakan did not account for the funds contributed before marriage in accounts that held both separate and community contributions. Second, the trial court did not account for earnings on these contributions. Had Hakan proved contributions made during marriage and the earnings attributable to those contributions, the remainder of the 401(k) could be reasonably traced to Hakan's separate contributions as funds originating from employment before marriage. Hakan did not, however, provide a basis to divide 401(k) contributions made before and during marriage in 401(k) accounts that held both.

Accordingly, we affirm the part of the court of appeals' judgment remanding this issue to the trial court.

\*      \*      \*      \*      \*

We reverse the court of appeals' judgment with respect to the bonus, affirm its judgment with respect to the marital home and Hakan's 401(k), and remand the case to the trial court for further proceedings consistent with this opinion.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** December 31, 2024

28